UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TREE TOP INDUSTRIES, INC., a Nevada Corporation
and DAVID REICHMAN, individually and in his
corporate capacity as PRESIDENT of TREE TOP
INDUSTRIES, INC.,

Case No.: 08 CIV. 5604

Plaintiffs,

- against -

DR. STEVEN M. HOEFFLIN, an individual, and XYZ
parties as will be revealed in the course of discovery,

Defendants.

**AMENDED
COMPLAINT**



Plaintiffs TREE TOP INDUSTRIES, INC. ("Tree Top") and DAVID REICHMAN

("Reichman"), individually and in his corporate capacity as President of Tree Top (herein

collectively known as the "Plaintiffs"), by their undersigned attorneys, Hantman & Associates,

for their complaint, allege the following:

### INTRODUCTION

1.      This action by Tree Top, a publicly traded company, and Reichman against Dr.

Steven M. Hoefflin ("Hoefflin"), www.**hoefflin**.com, a resident of the state of California,

who holds himself out as an international authority in aesthetic surgery.

2.      According to news reports, Hoefflin's famous patients have included Michael

Jackson, Janet Jackson, Elizabeth Taylor, Don Johnson, Nancy Sinatra, Joan Rivers,

Phyllis Diller, Sly Stallone, Donald Trump and his former wife Ivana, and Tony Curtis.

3.      Notwithstanding his prominence and notoriety, this is an action against him for

defamation per se, libel, duress, tortious interference with prospective economic

advantage, prima facie tort, trade disparagement and civil extortion which seeks damages

in excess of $75,000 for each claim in addition to punitive damages.

1

4.      This action arises out of numerous defamatory, libelous, harassing and extortionate emails and letters sent by Hoefflin to Reichman, Tree Top shareholders, law enforcement officials, the Security Exchange Commission, the Federal Bureau of Investigation and members of the press, and others as will be revealed in the course of discovery, all of which has resulted in substantial damage to Tree Top's stock price as well as Tree Top and Reichmans' reputations in the business community as well as Reichman's personal life.

5.      The statements and/or implications referred to herein were made with knowledge of their falsity or in reckless disregard of the truth or falsity of the statements (known as "actual malice").

6.      Therefore, this action is not an attempt to deter or punish Hoefflin for exercising his political or legal rights and has nothing to do with Hoefflin's right of petition or free speech under the Constitutions of the United States, New York or California and/or in connection with a public issue.

7.      The defamatory statements were made not only with actual malice but also for an ulterior purpose not related to Constitutional rights or free speech. Rather, the statements were made specifically to unlawfully extort and coerce Plaintiffs into returning the defendant's previous investment in a private company, Ludicrous Inc. ("Ludicrous"), which was later acquired by Tree Top, and to cause harm if they failed to do so.

8.      As a reflection of his spiteful and malicious intentions, being a shareholder of Tree Top stock, Hoefflin's actions have caused self-inflicted damages, as his own stock

2

has lost significant value as a result of his campaign of harassment, defamation and extortion.[1]

## **PARTIES**

9.    Plaintiff Tree Top is a publicly traded company (symbol: TTII) organized and incorporated under the laws of the State of Nevada with its principal place of business located at 666 Fifth Avenue, Suite 302, New York, New York 10103. As one of its principal business activities, Tree Top identifies and negotiates with a business target for a business combination transaction with an operating company which can be enhanced by virtue of Tree Top's management and organizational experience, as well as utilizing business contacts to promote substantial growth for the benefit of its shareholders, potential investors and the commercial public.

10.    As another one of its business purposes, Tree Top provides a means for a foreign or domestic private company, though a combination of resources, to become a public company whose securities would be qualified in the United States Secondary Capital market.

11.    Tree Top operates throughout the United States.

12.    Plaintiff David Reichman is the president of Tree Top and is a citizen of the State of New York.

13.    Reichman has been the Chairman of the Board of Directors, Chief Executive Officer, and President of Tree Top since 2003.

14.    Hoefflin, who holds himself out as an international authority in aesthetic surgery and an author, is a citizen of the state of California.

---

[1] A case against Hoefflin alleging similar claims to the case at bar is currently pending before the Superior Court of the State of California for the County of Los Angeles, Central District: Clearvision Productions, Inc. et al., v. Steven M. Hoefflin et al Case No. BC 392424

3

15.     Shareholders who are currently citizens of New York include but are not limited
        to, the following: a) PB Trust; b) JAP Consultants, Inc.; c) Joseph Brownstein; d) Shaye
        Jacobson; e) Justine Reichman; f) David Reichman.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over the defendant based on diversity
        jurisdiction, pursuant to 28 U.S.C.A. §1332, in that it is a civil action between citizens
        and a corporation of different states, where the amount in controversy exceeds $75,000
        exclusive of interest and costs.

17.     This Court has specific personal jurisdiction over defendant, as the defendant has
        purposely committed, within the state, the acts from which these claims arise, and/or have
        committed unlawful acts outside New York, knowing and intending that such acts would
        cause injury within the state.

18.     The Court also has jurisdiction over the defendant as Hoefflin, upon information
        and belief, expects or should reasonably expect the acts complained of herein to have
        consequences within the state and derives substantial revenue from interstate or
        international commerce.

19.     Venue is proper and convenient to this District, pursuant to 28 U.S.C. §1391,
        because this District is one in which a substantial part of the events or omissions giving
        rise to Plaintiffs' claims occurred

## BACKGROUND

4

20.     A group of technologically savvy entrepreneurs recognized the considerable effort

that was required to deliver information or entertainment over the Internet. These

entrepreneurs included:

- James Black, a purported contributor to the development of the Microsoft Windows operating system as well as the Microsoft Office program suite who claimed to have also contributed to the development of both Linux and Pearl, and;

- Mike Davis, a purported consultant with NASA, aerospace companies, and several governmental agencies who claimed to have designed computer software systems for naval vessels, military aircraft and NASA satellites. He also claimed experience in computer communication and telemetry systems and real-time programming, as well as systems architecture and design.

- Mervin Barclay Davis ("Merv"), an entrepreneur who, along with his son Joe Davis, envisioned various commercial applications and business models capable of exploiting the anticipated "new technology" being developed by James Black and, later, Mike Davis.

21.     James Black and his assistant, Trisha Woods, claimed to have worked for several

years developing this new technology, named by them and thereafter known to Plaintiffs

as NetThruster ("NetThruster").

22.     NetThruster's proprietary advanced content delivery network proposed to provide

media companies with high-performance, cost-effective delivery of high bandwidth

media and software via the Internet.

23.     Upon completion of its development, NetThruster was anticipated to be the

newest content delivery network for Internet distribution of video, music, games and

downloads.

24.     In anticipation of perfecting NetThruster and marketing and distributing it to the

public, Plaintiffs are informed and believe that Merv Davis, Joe Davis, James Black,

Trisha Woods, and others formed Ludicrous, a privately held Nevada Corporation on or about July 31, 2007.

25.     Defendant Hoefflin, touted by himself and others as Hollywood's preeminent plastic surgeon to the stars became aware of this promising 'NetThruster' technology while working on the development of his own concept for an animated short film with Merv Davis and his wife, Loretta Davis, who are engaged in that business at their offices in Hollywood, California.

26.     Plaintiffs are informed and believe that Hoefflin and the Davis' had been well-acquainted as close personal friends for over twelve years, including in the time that Loretta Davis had been a medical patient of Hoefflin's.

27.     At no time prior to the acquisition of Ludicrous by Tree Top did Hoefflin ever inform either Reichman, Tree Top, or its Board of Directors of the claims and allegations he now sets forth regarding Merv Davis and other members of the Davis family.

28.     Moreover, at no time either before or after the acquisition of Ludicrous by Tree Top did Merv Davis ever disclose to Tree Top, Reichman, or it's Board of Directors, nor did he provide any details regarding the accuracy or inaccuracy of the various allegations and charges made by Hoefflin, including any alleged felony convictions against the Davis family members.

29.     Plaintiffs are further informed and believe that Hoefflin, after learning about NetThruster, became very excited about the potential business applications for the technology, actively sought to and later did invest $500,000 in privately held Ludicrous in exchange for One Million (1,000,000) shares of Ludicrous stock.

6

30.     Shortly after the formation of Ludicrous, Merv and Joe Davis contacted Plaintiff

Reichman, and inquired as to whether Tree Top would be interested in acquiring

Ludicrous and in assuming a principal management position in the company.

31.     Following introduction by Ludicrous of its purportedly groundbreaking

technology, Tree Top acquired Ludicrous in a stock transaction as detailed in the Security

and Exchange Commission's Form 8-K report:

> "Effective November 1, 2007, Tree Top Industries, Inc., a Nevada
> corporation (the *"Company"*), closed its Agreement and Plan of
> Reorganization (the *"Agreement and Plan of Reorganization"*) with
> Ludicrous, Inc., a Nevada corporation (*"Ludicrous"*), and the security holders of
> Ludicrous (collectively, the *"Ludicrous Security holders"*) pursuant to which the
> Company acquired all of the issued and outstanding capital stock of
> Ludicrous, and the Ludicrous Security holders assumed control of the Company
> (the *"Business Combination"*). The Business Combination is described in greater
> detail in Item 2.01 of this Report on Form 8-K. A copy of the Agreement and
> Plan of Reorganization was filed as an exhibit to the Report on Form 8-K filed
> by the Company with the Securities and Exchange Commission dated October
> 19, 2007.

## SECTION 2. FINANCIAL INFORMATION

## ITEM 2.01 COMPLETION OF ACQUISITION OR DISPOSITION OF ASSETS.

### GENERAL

The Agreement and Plan of Reorganization by and between the Company,
Ludicrous and the Ludicrous Security holders closed effective November 1,
2007. Pursuant to the Business Combination, the Company is issuing directly
to the Ludicrous Security holders a total of 68,000,000 shares of its common
stock, par value $0.001 (the *"Shares"*), in exchange for all of Ludicrous'
issued and outstanding common stock. Upon the closing of the Business
Combination, Ludicrous became a wholly owned subsidiary of the Company,
and the Ludicrous Security holders became shareholders of the common stock of
the Company. The Company expects to continue to operate Ludicrous as a
wholly-owned subsidiary. After the Business Combination the Company does
not expect to change its name.

Upon completion of the Business Combination, and including stock options
and warrants to the extent that they are exercisable within 60 days, the Company

7

expects to have a total of approximately 72,228,400 shares of its common stock outstanding. The outstanding shares will be owned approximately 4.6% by David Reichman, the Chairman of Ludicrous and the Chairman, Chief Executive Officer, and President of the Company, 31.8% by James Black, the Chief Technical Officer of Ludicrous, 1.4% by Mike Davis, the Chief Operating Officer of Ludicrous, 9.7% by Wendy Davis, 27.7% by L.G. Davis, and 11.1% by Justine Reichman. For purposes of the foregoing, beneficial ownership and percentage ownership are determined in accordance with the rules of the Securities and Exchange Commission and include voting or investment power with respect to Shares of common stock. Under these rules, shares of common stock issuable under stock options that are currently exercisable or exercisable within 60 days of November 1, 2007, are deemed outstanding for the purposes of computing the percentage ownership of the person holding the options but are not deemed outstanding for the purpose of computing the percentage ownership of any other person."[2]
http://www.secinfo.com/d1ZGUy.u5r.htmm (Exhibit A)

32.     Significantly, as a result of this merger, Hoefflin was now a shareholder in Tree

Top solely by virtue of his previous ownership of Ludicrous stock, rather than as a result

of any direct investment of personal funds into Tree Top.

33.     One of the requirements in consummating this acquisition by Tree Top was that

all Ludicrous shareholders, including Hoefflin, were required to sign a document

consenting to the acquisition.  (Acquisition Agreement - Exhibit B)

34.     As a condition to the acquisition, all former Ludicrous shareholders' shares were

subject to a two (2) year voting trust, over which the Chief Executive Officer of Tree

Top; [Reichman] had voting power.

http://www.secinfo.com/d1ZGUy.u61.htm?Find=hoefflin#10thPage (Exhibit C).

35.     This voting trust was put in place to assure that Ludicrous' proprietary

NetThruster technology became completed in the manner contemplated by the parties and

was a fully functioning, effective product worthy of the value exchanged by Tree Top.

---

[2] In total, the various Davis family/affiliated shareholders, collectively, would own 45.63% of TTII stock in exchange for their Ludicrous holdings.

36.     However, contrary to various representations, NetThruster has since been proven
        to be virtually worthless as developed and delivered to Tree Top by Ludicrous while
        there were also difficulties in dealing with James Black, its principal technology
        architect.

37.     As a result thereof, James Black subsequently resigned from any affiliations with
        Ludicrous or Tree Top and, upon information and belief, is working in conjunction with
        and/or assisting Hoefflin regarding the matters set forth herein.

38.     Notwithstanding the foregoing, Hoefflin, who had first been introduced to
        Reichman at or around August, 2007 and again on later occasions, requested that his wife
        Pamela Hoefflin (hereinafter referenced collectively for convenience where applicable as
        "the Hoefflins") contact Reichman to arrange a meeting with Hoefflin on March 16, 2008
        regarding any possible interest Tree Top might have in acquiring a real property lease in
        the West Los Angeles area which the Hoefflin's owned and/or controlled.

39.     At this meeting and thereafter, Hoefflin also indicated that the Hoefflins were also
        interested in purchasing additional shares in Tree Top. Reichman then advised the
        Hoefflins that they should seek the counsel of their own CPA or attorney regarding any
        further purchase of Tree Top shares.

40.     Also at the March 16, 2008 meeting and thereafter, the Hoefflins proposed that
        Reichman, on Tree Top's behalf, rent certain office space in Santa Monica, California
        owned in part or substantially controlled by the Hoefflins, which could thereafter serve as
        Tree Top's headquarters.

41.     Inasmuch as the proposed office space would cost upwards of $30,000 per month
        in rent, Reichman advised the Hoefflins that the space was not a financially viable option
        for Tree Top at that time.

9

42.     The Hoefflins asked Reichman his advice as to whether they should sell or lease their property to others while Reichman reiterated his advice that the Hoefflins seek outside advice so as to remain neutral and uninvolved in the Hoefflins personal financial and business affairs.

43.     Towards the end of the March 16, 2008 meeting and thereafter, Hoefflin became increasingly aggressive and began discussing the possibility of him [Hoefflin] assuming the role as Chairman of a separate, wholly owned subsidiary of Tree Top, known as GoHealthMD, Inc.; which he [Hoefflin] would purportedly then operate to address health problems throughout the world.

44.     Cautious, yet amenable to a potential opportunity, Reichman listened to Hoefflin's proposal.

45.     Hoefflin claimed that he was the owner of numerous patents that "were worth billions of dollars" and that Tree Top would greatly benefit from his expertise and assets.

46.     Thereafter, continuing discussions relating to the purchase/lease of their real property, Pamela Hoefflin then indicated that if Tree Top decided to change its mind, specific financial information would have to be reviewed by the Hoefflins.

47.     Reichman informed her that all of Tree Top's public financial information was accessible through the internet, and invited her to review all of the information for herself and that her CPA and or attorneys should know that as a publicly traded firm, the information was available in or through a site known as: OTCBB.com.

48.     After the foregoing discussions concluded, upon information and belief, the Hoefflins went online to the Security and Exchange Commission's website and first made particular note of the amount of shares each shareholder owned.

10

49.    Upon information and belief, noticing a number of sharcholders with significantly more shares than himself, Hoefflin became enraged and immediately began writing a series of accusatory and defamatory (extortion and blackmail) emails demanding the return of the Hoefflins' Ludicrous investment.

50.    Hoefflin first excoriated Ludicrous' founders as frauds and cheats, and, thereafter, attacked Plaintiffs as conspirators, frauds and cheats in their own right for refusing to return his investment in Ludicrous.

51.    Upon information and belief, Hoefflin has directly and indirectly, through the use of 'straw men' using false names and cyber addresses [e.g.: "George Bush" <tree_top_industries_2008@yahoo.com] acting in a conspiracy with others while hiding behind cyber walls in cyberspace, has caused a long list of knowingly false and defamatory e-mails and correspondence to be published and delivered to third parties for the malicious and unlawful purpose of causing harm to the Plaintiffs should they refuse to acquiesce to his "blackmail" and extortionist demands.

52.    A non-exhaustive list of the knowingly false and misleading defamatory comments and accusations made by Hoefflin about Reichman and Tree Top (including its officers and directors) then directed to Tree Top shareholders, as well as members of various federal and state law enforcement agencies, regulatory organizations, private individuals and the media/press is as follows:

> "You [Reichman] are creating crazy SEC reports and overstating company hardware and goodwill assets (TTII) you're erroneous and false SEC reports for TTII and probably the other 2 companies, and many other apparent improprieties are just exploding red flags." (May 8, 2008 correspondence to David Reichman) (Exhibit D);

> "He [Reichman] is the obvious ringleader and investor money thief in the group." (May 27, 2008 correspondence to Loretta Davis) (Exhibit E);

"In addition the investigator stated that 'He [Reichman] is worse than the bank robber that held up a bank and left his checkbook at the window. He [Reichman] also left his Photo ID Driving License, all of the criminal SEC filings, his cell phone number, his Bahamas bank account, and the name and phone numbers of all thieves in TTII 'Ocean 13' members in crime.' " (May 27, 2008 correspondence to Loretta Davis) (Exhibit E);

"He [Reichman] may have also been in Jail." (May 27, 2008 correspondence to Loretta Davis) (Exhibit E);

"He [Reichman] looked like a Hyena dressed in lambs clothing watching all of the potential investor victims as they passed by and were interviewed." (May 27, 2008 correspondence to Loretta Davis) (Exhibit E);

"His [Reichman] pathological greed just stood out like a search light. Paying himself a 2.7 million dollar salary, repaying bad debt in his original TTII (a bad company with a huge debt, 5 lawsuit judgments that were never paid, probably the association with previous crimes, and just the worse company to place Ludicrous into, was an attempt for him to "pay off his personal mismanagement of another company" prior to it joining Ludicrous in Nov 1, 2007." (May 27, 2008 correspondence to Loretta Davis) (Exhibit E);

"David [Reichman] pocketed the money, flew to the Bahamas telling people that he was going to New York, or pocketed the money himself and cooked the books so it looked like we only invested $600,000. Possibly he paid himself a portion of his $2.7 Million dollar salary when there was no company income, or other criminal activity." (May 27, 2008 correspondence to Loretta Davis) (Exhibit E);

"He and David [Reichman] obviously saw and possibly covered up some of the problematic SEC filings and accounting." (May 27, 2008 correspondence to Loretta Davis) (Exhibit E);

"David [Reichman] flew his own criminal attorney in from New York and had him harass and tamper with witnesses Paul Brownstein and Jim Black." (May 27, 2008 correspondence to Loretta Davis) (Exhibit E);

"Penny Stock Swindling: Tree Top Industries, Inc (TTII). This is a long existing dirty company owned by swindler David Reichman. He started his career out in 1978 by turning in, with his then wife Sue, 125 bogus chiropractor bills to his insurance company." (June 4, 2008 correspondence to the Securities and Exchange Commission) (Exhibit F);

"They then 'reverse merged" this company into David Reichmann's TTII Public Company that already had fabricated $15 Million dollar losses without

any historical products or activities." (June 4, 2008 correspondence to the Securities and Exchange Commission) (Exhibit F);

"The President is David Reichman who is one of the most suspicious and poorly performing individuals who I have ever met. His trail of irregularities and SEC filings is so blatant that anyone looking at it sees his obvious activities." (Undated correspondence to a Mr. Krause-Leemon) (Exhibit G);

"It has been determined that the threats on my life and those of James Black, are coming from this group, including Rudy Durand and the "money man", David Reichman." (June 5, 2008 correspondence to Tom) (Exhibit H)...Email to all that TTI was run by a criminal group.

53.    Many of the e-mails described above, alleging unsubstantiated and false criminal activity on Reichman's part, emanated, upon information and belief, from an e-mail address created by Hoefflin, or at his direction, by an unknown co-conspirator, to cause the appearance that it was being sent on behalf of Tree Top; which e-mail's were thereafter specifically addressed to recipients obtained from a proprietary Tree Top database which neither Hoefflin nor his co-conspirators had a legal right or lawful access to.

54.    Since Hoefflin's interstate e-mail and correspondence campaign of blatant extortion and defamation began in April, 2008, Tree Top's stock price has plummeted from $15.00 per share [closing price as of 04/01/08] to $2.00 per share [closing price as of 06/18/08] and many potential customers and investors have begun to question Tree Top's financial wherewithal and viability.

55.    After learning that NetThruster was effectively a worthless technology, coupled with later acquired knowledge that other Ludicrous shareholders owned a larger proportionate stake in Tree Top as a result of the acquisition of Ludicrous than he did, Hoefflin commenced a relentless and defamatory campaign calculated to skirt the voting trust and to put a 'gun-to-the-head' of Tree Top demanding the return of his investment in

13

Ludicrous, plus interest, or suffer the consequences of harm in a manner that he openly claims to have caused to others in the past.

56.     In an effort to avoid litigation, Robert J. Hantman, Esq., the attorney for the Plaintiffs, sent Hoefflin two (2) cease and desist letters (Exhibit I) demanding the immediate cessation of his libelous and malicious letter-writing campaign.

## FIRST CLAIM
## LIBEL

57.     Plaintiffs repeat and reallege, as if set forth fully herein, the allegations contained in the previous paragraphs.

58.     Hoefflin wrote numerous statements which refer to the Plaintiffs.

59.     Attached hereto and incorporated herein as Exhibits D-H, as previously detailed herein above, are true and correct copies of such statements also evidencing thereon delivery to others.

60.     Said statements were unquestionably defamatory in nature as they falsely allege that the Plaintiffs had committed crimes or otherwise engaged in unlawful activities.

61.     These statements have affected the Plaintiff's standing in the business community which unquestionably had, and continues to have, a detrimental effect on Reichman's own personal reputation, Tree Top's day-to-day business operations and has directly led to it's plummeting stock price.

62.     The numerous allegations by Hoefflin were completely false and Hoefflin was fully aware that they were false or, alternatively, knew or should have known that there was no factual basis or actual evidence supporting his false, misleading and defamatory claims.

14

63.      Hoefflin's numerous defamatory statements were malicious, in that, they were made with full knowledge of their falsity and published to numerous third parties via emails and other correspondence with the sole purpose of coercing Plaintiffs' conduct to yield to his extortionate demands and, failing that result, to defame and harm both Tree Top and Reichman, personally, for their collective, perceived intransigence.

64.      The Plaintiffs have each suffered (special) damages in that, among other injuries, Tree Top's stock price has plummeted from $15.00 per share -- the price at the time Hoefflin's defaming campaign began - to its present per share price of $2.00.

65.      As a result of Hoefflin's actions, the Plaintiffs have suffered damages well in excess of $75,000, exclusive of interests and costs, the specific amount of which is to be proven at trial.

## SECOND CLAIM
## PRIMA FACIE TORT

66.      Plaintiffs repeat and reallege, as if set forth fully herein, the allegations contained in the previous paragraphs.

67.      Hoefflin intentionally and maliciously wrote the aforementioned defamatory statements with the intention of inflicting harm on both Tree Top and Reichman's reputations and financial well being in the manner described herein above.

68.      This malicious letter and email writing campaign which defamed the Plaintiffs resulted in special damages, including the stock price plummeting from $15.00 per share – the price at the time Hoefflin's defaming campaign began - to its present per share price of $2.00.

69.      In addition, as a result of Hoefflin's tortious actions, Tree Top and its president, Reichman, have found it increasingly difficult to attract significant investors or to acquire

additional companies, as Tree Top's reputation and deflated stock price have left the

marketplace wary of Tree Top's financial stability, thus effectively paralyzing Tree Top's

ability to grow and prosper.

70.        Specifically, in his May 8, 2008 correspondence to David Reichman, Dr. Hoefflin

stated:

> "You and 'Barclay' clearly stated that Pamela and I could have our investment of
> $1.1 Million with interest back at this time. We are demanding that you return
> this amount to us in cashier's checks placed in the hands of our attorney Robert
> Silverman, Esq. before the close of business on May 27, 2008. We will specify
> the exact route and details on the following page. I don't trust any of you. We
> will not sign any papers nor talk with or see any of you ever again." (Exhibit D)

71.        No such promise was ever made to Hoefflin by anyone associated with the

operation or control of Tree Top. Hoefflin's actions are without justification and solely

motivated by ill-will and malice intended to cause harm to Tree Top and Reichman for

refusing to acquiesce to his extortionist demand for Tree Top and Reichman to return his

investment (plus interest) in Ludicrous by a past date certain.

72.        Ironically and as evidence of his vitriol and anger, as a shareholder in Tree Top,

Hoefflin's actions have also resulted in his own stock losing significant value.

73.        As a result of Hoefflin's tortious actions, in addition to the loss of significant

share value, Tree Top has suffered irremediable economic damages, including but not

limited to the loss of two (2) particular specific business opportunities from committed

internet content providers resulting in the loss of hundreds of millions of dollars in

revenue that would have reasonably been realized by Tree Top beginning within the next

several months and continuing thereafter.

## THIRD CLAIM
## TORTIOUS INTEREFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

74.     Plaintiffs repeat and reallege, as if set forth fully herein, the allegations contained in the previous paragraphs.

75.     Tree Top has had two specific and viable opportunities since its acquisition of Ludicrous to enter into contracts to acquire additional companies to Tree Top's benefit.

76.     Through wrongful means - specifically the writing and distribution of defamatory emails and letters – Hoefflin directly, maliciously and intentionally interfered with the Plaintiffs' business opportunities in the specific manner as set forth herein above.

77.     But for Hoefflin's conduct, the Plaintiffs would have entered into these prospective contracts.

78.     As a result of Hoefflin's tortious conduct, the Plaintiffs have suffered damages well in excess of $75,000, exclusive of interests and costs, the specific amount of which is to be proven at trial.

### FOURTH CLAIM
### DEFAMATION PER SE

79.     Plaintiffs repeat and reallege, as if set forth fully herein, the allegations contained in the previous paragraphs.

80.     Throughout Hoefflin's defamatory statements, as set forth in his aforementioned the emails and letters (e.g. Exhibits D-H), Hoefflin has specifically alleged Reichman committed numerous serious crimes and continues to engage in unlawful activities.

81.     In addition, Hoefflin's accusations, which were published without permission, unquestionably tend to injure Reichman, individually, and Tree Top as regards trade, business, or profession.

17

82.    The numerous allegations by Hoefflin were completely false and Hoefflin was fully aware of their falsity, or alternatively, Hoefflin knew or should have known that there was no factual basis or evidence supporting his false and defamatory claims.

83.    Hoefflin's numerous defamatory statements were malicious, in that, they were made with full knowledge of their falsity and published to numerous third parties via emails and other correspondence, with the sole purpose of defaming Tree Top and Reichman.

84.    As these defamatory statements, which constitute fault as judged by a negligence standard, fall within two (2) of the categories necessary to establish Defamation Per Se, the law presumes that damages will result, and therefore damages need not be alleged or proven.

## FIFTH CLAIM
## DURESS

85.    Plaintiffs repeat and reallege, as if set forth fully herein, the allegations contained in the previous paragraphs.

86.    Hoefflin threatened to unlawfully release knowingly false and misleading information to authorities with the intent of inducing law enforcement and/or regulatory agencies to investigate and preferably indict Tree Top and/or Reichman.

87.    Specifically, in his May 8, 2008 correspondence to David Reichman, Dr. Hoefflin stated:

> "Barclay's [Merv Davis'] history, as I have been told, of threatening to harm anyone who has information on him would be a very foolish act against Pamela or me. Therefore, these recordings, notes, documents, photos, and a letter from me are sitting in my attorney's office safe. No authority has yet to see this information. He is instructed to release all of this information to the authorities if anything whatsoever is attempted against us or if you go back on your

18

agreement. Otherwise, it stays there. You and 'Barclay' clearly stated that Pamela and I could have our investment of $1.1 Million with interest back at this time. We are demanding that you return this amount to us in cashier's checks placed in the hands of our attorney Robert Silverman, Esq. before the close of business on May 27; 2008.We will specify the exact route and details on the following page. I don't trust any of you. We will not sign any papers nor talk with or see any of you ever again." (Exhibit D)

88.    Hoefflin made these threats for the sole purpose of compelling Tree Top/Reichman to return his investment which he made in Ludicrous. Hoefflin had no legal right to demand repayment of his investment and Tree Top/Reichman had every legal right to abstain from returning Hoefflin's prior investment.

89.    As a result of Hoefflin's tortious conduct, the Plaintiffs have suffered damages well in excess of $75,000, exclusive of interests and costs, the specific amount of which is to be proven at trial.

## SIXTH CLAIM
## CIVIL EXTORTION

90.    Plaintiffs repeat and reallege, as if set forth fully herein, the allegations contained in the previous paragraphs.

91.    Plaintiffs are, as specifically set forth herein above, informed and believe and based thereon allege that defendant Hoefflin invested money in a private stock company, Ludicrous, and that Ludicrous was subsequently acquired by a publicly traded company, Tree Top; which acquisition Hoefflin specifically authorized and consented to.

92.    Plaintiffs are, as specifically set forth herein above, informed and believe and based thereon allege that defendant Hoefflin, as a result of the above-alleged investment, currently owns restricted shares of stock in Tree Top.

93.     Plaintiffs are, as specifically set forth herein above, informed and believe and based thereon allege that defendant Hoefflin is unsatisfied with his investment in Tree Top, but cannot sell his shares because his shares of stock are restricted.

94.     Plaintiffs are, as specifically set forth herein above, informed and believe and based thereon allege that defendant Hoefflin is under the impression that Tree Top has an obligation to either refund, buy back, or otherwise find a new investor to take over Hoefflin's Tree Top stock which he owns as a result of Tree Top's subsequent acquisition of a private stock company in which he invested.

95.     Hoefflin has threatened to "expose" Plaintiffs Tree Top and Reichman to criminal prosecution if he is not paid $1.1 million. Specifically, Hoefflin has threatened to contact the FBI, the SEC and other federal authorities and to turn over to those authorities what Hoefflin claims to be "evidence" supporting the defamatory statements as specifically alleged herein above. Hoefflin claims that such evidence is locked in his attorney's safe and will be delivered to the "authorities" unless Tree Top and Reichman comply with Hoefflin's demands.

96.     Hoefflin's efforts to blackmail Tree Top and Reichman constitute criminal conduct as defined in United States Code section 18 U.S.C.A. §1951, the California Penal Code §519, and the New York Penal Code §135.60, and are so extreme and outrageous as to be intolerable in a civilized society.

97.     As a direct and proximate result of Hoefflin's efforts to blackmail Tree Top and Reichman, Tree Top has suffered severe financial consequences in that it's publicly traded stock value has plummeted and Reichman has had his business reputation tarnished such that he has lost business opportunities for the benefit of Tree Top and himself, among other things.

98.      In doing the things herein alleged, defendant acted willfully, with malice, in conscious disregard of Tree Top's and Reichman's rights, and with intent to cause injury to them. Plaintiffs are therefore entitled to punitive or exemplary damages in an amount appropriate to punish defendant and deter others from engaging in similar misconduct.

99.      As a result of Hoefflin's tortious conduct, the Plaintiffs have suffered damages well in excess of $75,000, exclusive of interests and costs, the specific amount of which is to be proven at trial.

## FOR A SEVENTH CLAIM
## TRADE DISPARAGEMENT

100.      Plaintiffs repeat and reallege, as if set forth fully herein, the allegations contained in the previous paragraphs.

101.      Defendant has disparaged the Plaintiffs' good name and reputation in the business community, as Hoefflin has been improperly contacting - through emails and other correspondence - shareholders, law enforcement, the Security Exchange Commission, the Federal Bureau of Investigation and members of the press, which resulted in substantial damage to Tree Top's stock price as well as Tree Top and Reichmans' reputations in the business community as well as Reichman's personal life.

102.      Many of the e-mails described above allege knowingly false, misleading and unsubstantiated criminal activity on the part of Reichman and Tree Top.

103.      As a result of Hoefflin's tortious conduct, the Plaintiffs have suffered damages well in excess of $75,000, exclusive of interests and costs, the specific amount of which is to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request the following relief:

104.     For the first claim, Tree Top and Reichman request an order enjoining the defendant to cease and desist from writing any further defamatory emails and correspondence regarding Tree Top and Reichman

105.     For the first claim, Tree Top requests an amount to be determined at trial but not less than $10,000,000.

106.     For the first claim, Reichman requests an amount to be determined at trial but not less than $10,000,000.

107.     For the second claim, Tree Top requests an amount to be determined at trial but not less than $10,000,000.

108.     For the second claim, Reichman requests an amount to be determined at trial but not less than $10,000,000.

109.     For the third claim, Tree Top requests economic damages in an amount to be proven at the time of trial, including but not limited to, the loss of two (2) particular specific business opportunities from committed internet content providers resulting in the loss of hundreds of millions of dollars in revenue that would have been realized by Tree Top beginning within the next several months.

110.     For the third claim, Reichman requests economic damages in an amount to be proven at the time of trial, including but not limited to, the loss of two (2) particular specific business opportunities from committed internet content providers resulting in the loss of hundreds of millions of dollars in revenue that would have been realized by Tree Top beginning within the next several months.

111.     For the fourth claim, Tree Top requests an amount to be determined at trial but not less than $10,000,000.

112.    For the fourth claim, Reichman requests an amount to be determined at trial but not less than $10,000,000.

113.    For the fifth claim, Tree Top requests an amount to be determined at trial but not less than $10,000,000.

114.    For the fifth claim, Reichman requests an amount to be determined at trial but not less than $10,000,000.

115.    For the sixth claim, Tree Top requests an amount to be determined at trial but not less than $10,000,000.

116.    For the sixth claim, Reichman requests an amount to be determined at trial but not less than $10,000,000.

117.    For the seventh claim, Reichman requests an amount to be determined at trial but not less than $10,000,000.

118.    For the seventh claim, Reichman requests an amount to be determined at trial but not less than $10,000,000.

119.    Consequential and Punitive Damages on all claims.

120.    Plaintiffs' request that the following individuals be made available for expedited discovery including, but not limited to, depositions of: (1 Pamela Hoefflin; (2) James Black; (3) Trisha Woods, and; (4) Paul Brownstein; in addition to electronic discovery of defendants computer hard drives pursuant to a "Protocol" and appropriate "Protective Order".

121.    An Order continuing the voting trust of Hoefflin's stock until the conclusion of this litigation and, thereafter, the value of the stock to be a credit against any final judgment of Plaintiffs'.

122.    Plaintiffs request attorney fees and costs of this action;

123.    Plaintiffs request such other relief as is just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues and claims so triable.

Dated: July 18, 2008
    New York, New York

HANTMAN & ASSOCIATES

/ s /

By: Robert J. Hantman (RH-3947)
www.Hantmanlaw.com
1414 Avenue of the Americas
Suite 406
New York , NY 10019
Telephone: (212) 684-3933
Facsimile:  (212)755-1989
Attorneys for Plaintiffs

24

*SEC Info*   Home   Search   My Interests   Help   Sign In   *Please Sign In*

## Tree Top Industries/Inc · 8-K · For 11/1/07

Filed On 11/6/07 8:37pm ET · SEC File 0-10210 · Accession Number 1065949-7-180

Find!¹

Help     *Wildcards: ? (any letter), * (many). Logic: for Docs: & (and), | (or). Re'val. | (anywhere), "(&)" (near).*   in this entire Filing.   Show Docs searched and every hit.

| As Of | Filer | Filing | As/For/On Docs:Pgs | Issuer | Agent |
|---|---|---|---|---|---|
| 11/07/07 | Tree Top Industries/Inc | 8-K:(1,2,4,5)11/01/07   3·37 | | | Cole Candi K/VA |

### Current Report · Form 8-K
#### Filing Table of Contents

| Document/Exhibit | Description | Pages | Size |
|---|---|---|---|
| 1: 8-K | Current Report | 8 | 27K |
| 2: EX.99.2 | Miscellaneous Exhibit | 8 | 14K |
| 3: EX.99.3 | Miscellaneous Exhibit | 21 | 79K |

### 8-K · Current Report
#### Document Table of Contents

**Page**        *(sequential)*                                              *(alphabetic)*                          Top

1  1st Page                                                           • Alternative Formats (RTF, XML, et al.)
2  Item 1.01. Entry Into A Material Definitive Agreement              • Change in Shell Company Status
*  Item 2.01. Completion of Acquisition or Disposition of Assets   ?  • Completion of Acquisition or Disposition of Assets
5  Item 3.02. Unregistered Sales of Equity Securities                 • Departure of Directors or Principal Officers, Election of Directors;
*  Item 5.02. Departure of Directors or Principal Officers; Election of    Appointment of Principal Officers
   Directors; Appointment of Principal Officers                      • Entry Into A Material Definitive Agreement
*  Item 5.06. Change in Shell Company Status                         • Unregistered Sales of Equity Securities

| 8-K | | 1st Page of 8 | | TOC | Top | Previous | Next | Bottom | | Just 1st |

---

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

---

FORM 8-K

---

PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934

DATE OF REPORT (DATE OF EARLIEST EVENT REPORTED): NOVEMBER 1, 2007

---

TREE TOP INDUSTRIES, INC.

---

(Exact name of registrant as specified in its charter)

---

NEVADA

---

(State or other jurisdiction of incorporation)

000-10210                                      83-0250943

---

(Commission File Number)                (I.R.S. Employer Identification No.)

1841 N. FORMOSA AVENUE,
PICKFORD BUILDING, #109,
WEST HOLLYWOOD, CALIFORNIA                     90046

---

(Address of principal executive offices)       (Zip Code)

(323) 850-2450

---

(Registrant's telephone number, including area code)

511 AVENUE OF THE AMERICAS, SUITE 800, NEW YORK, NEW YORK 10011

---

(Former name, former address and former fiscal year,
if changed since last report)

---

Check the appropriate box below if the Form 8-K filing is intended to
simultaneously satisfy the filing obligation of the registrant under any of the
following provisions.

|_| Written communications pursuant to Rule 425 under the Securities Act (17
CFR230.14d-2(b))

|_| Soliciting material pursuant to Rule 14a-12 under Exchange Act (17
CFR240.14a-12)

|_| Pre-commencement communications pursuant to Rule 14d-2(b) under the
Exchange Act (17 CFR240.14d2(b))

|_| Pre-commencement communications pursuant to Rule 13e-4(c) under the
Exchange Act (17 CFR240.13e4(c))

---

-1-

| 8-K | 2nd Page of 8 | TOC | 1st | Previous | Next | Bottom | Just 2nd |

## SECTION 1. REGISTRANT'S BUSINESS AND OPERATIONS

### ITEM 1.01 ENTRY INTO A MATERIAL DEFINITIVE AGREEMENT.

Effective November 1, 2007, Tree Top Industries, Inc., a Nevada corporation (the "Company"), closed its Agreement and Plan of Reorganization (the "Agreement and Plan of Reorganization") with Ludicrous, Inc., a Nevada corporation ("Ludicrous"), and the security holders of Ludicrous (collectively, the "Ludicrous Securityholders") pursuant to which the Company acquired all of the issued and outstanding capital stock of Ludicrous, and the Ludicrous Securityholders assumed control of the Company (the "Business Combination"). The Business Combination is described in greater detail in Item 2.01 of this Report on Form 8-K. A copy of the Agreement and Plan of Reorganization was filed as an exhibit to the Report on Form 8-K filed by the Company with the Securities and Exchange Commission dated October 10, 2007.

## SECTION 2. FINANCIAL INFORMATION

### ITEM 2.01 COMPLETION OF ACQUISITION OR DISPOSITION OF ASSETS.

#### GENERAL

The Agreement and Plan of Reorganization by and between the Company, Ludicrous and the Ludicrous Securityholders closed effective November 1, 2007. Pursuant to the Business Combination, the Company is issuing directly to the Ludicrous Securityholders a total of 68,000,000 shares of its common stock, par value $0.001 (the "Shares"), in exchange for all of Ludicrous' issued and outstanding common stock. Upon the closing of the Business Combination, Ludicrous became a wholly owned subsidiary of the Company, and the Ludicrous securityholders became shareholders of the common stock of the Company. The Company expects to continue to operate Ludicrous as a wholly-owned subsidiary after the Business Combination. The Company does not expect to change its name.

Upon completion of the Business Combination, and including stock options and warrants to the extent that they are exercisable within 60 days, the Company expects to have a total of approximately 72,228,400 shares of its common stock outstanding. The outstanding shares will be owned approximately 4.4% by David Ackerman, the Chairman of Ludicrous and the Chairman, Chief Executive Officer, and President of the Company. 31.8% by James Black, the Chief Technical Officer of Ludicrous, 1.4% by Mike Davis, the Chief Operating Officer of Ludicrous, 0.7% by Wendy Davis, 27.7% by E.G. Davis, and 11.1% by Justine Reichman. For purposes of the foregoing, beneficial ownership and percentage ownership are determined in accordance with the rules of the Securities and Exchange Commission and include voting or investment power with respect to shares of common stock. Under these rules, shares of common stock issuable under stock options that are currently exercisable or exercisable within 60 days of November 1, 2007, are deemed outstanding for the purposes of computing the percentage ownership of the person holding the options but are not deemed outstanding for the purpose of computing the percentage ownership of any other person.

#### BUSINESS AND MANAGEMENT OF LUDICROUS, INC.

Ludicrous, Inc. is a Nevada corporation formed on August 1, 2007 to engage in the installation and build-out of its network for commercialization of its proprietary technology for the telecommunications industry. The principals of Ludicrous spent a combined eleven years developing and designing NetThruster.com prior to Ludicrous being incorporated.

#### BACKGROUND

Internet users are usually unaware of the considerable effort that is needed to deliver information or entertainment over the Internet. The process of data transmission is called "content delivery" and it is usually handled by the website where the information resides.

-2-

| 8-K | 3rd Page of 9 | TOC | 1st | Previous | Next | Bottom | Just 3rd |

This manner of sending entertainment directly from the provider to the end-user works well if the amount of information is relatively small (one to three minutes of low resolution video or audio) and demand for the content is infrequent. Under these circumstances the host website's own servers can service a reasonable number of end-users simultaneously. This manner of content delivery has served the Internet for a good number of years, however, the demand for broadband services has recently been increasing dramatically. For example, word-of-mouth about a new video clip can severely tax the transmission capability of the host website when demand exceeds the host's transmission capability. Even now the delivery of DVD quality motion pictures cannot be supported by most traditional server-based websites. A different strategy is needed to cope with sending large amounts of information and reliably reconstituting that information at the receiving end. There are companies that specialize in transmission of high quality information in massive amounts such as Limelight Networks(R), which does so by utilizing a worldwide network of transmission nodes that split the information into several streams and reintegrate these streams at the end-user's destination.

This third party solution to information transmission is estimated to be around $2 billion in yearly sales and research firms predict that figure will double every couple of years. By building upon its Net Thruster(R) technology, Ludicrous is developing the capability to rapidly and reliably send high quality content on demand to any Internet destination. In addition, the information can be safeguarded against theft through the use of Ludicrous' own network. The information can be transmitted and received in a manner that prohibits copying and understanding by anyone other than the targeted recipient. As a result, when the content is entertainment, there is a built-in safeguard against pirating the information.

### NETTHRUSTER.COM TECHNOLOGY

Ludicrous has developed the NetThruster.com(R)tm content delivery network. NetThruster.com is the newest content delivery network for Internet distribution of video, music, games and downloads. NetThruster.com's advanced content delivery network provides media companies with high-performance, cost-effective delivery of high bandwidth media and software via the Internet. NetThruster.com has created a scalable system for distributed high-bandwidth media delivery to large audiences. Management believes that Ludicrous' delivery solutions are uniquely tailored to the specific needs of those doing distributed on-demand and live delivery of video, music, games and downloads.

Built from day one as a media delivery platform, NetThruster.com distributes massive amounts of numerous forms of digital video, including live streaming user-generated content proliferating on popular video sharing sites to virtually any Internet-connected device with a screen. NetThruster.com content delivery provides http/web distribution of all digital media formats. Digital media files such as video, music, graphics, and software are delivered with full fidelity (no packet loss) from NetThruster.com's content delivery location at One Wilshire in Los Angeles, California, directly to the end user's IP-connected computer or device.

NetThruster.com Streaming Media provides on-demand and/or live streaming to customers worldwide for all major formats including Windows Media, Flash Video, QuickTime, Real and MP3 audio. Larger audiences embracing the "digital lifestyle" are requesting greater and greater volumes of content every day. To meet the high expectations of these enthusiastic users, NetThruster.com content delivery enables content providers to make their entire asset libraries available for 24x7 global distribution to broadband and mobile audiences. This frees content providers to focus on giving their audiences what they want, without concern for their delivery infrastructure.

-3-

| 8-K | 4th Page of 8 | TOC | 1st | Previous | Next | Bottom | Just 4th |

**MANAGEMENT**

TRISHA WOODS, President and Acting Chief Financial Officer, age 27, has been the President, Acting Chief Financial Officer, and a director of Ludicrous since its inception in August 2007. Ms. Woods is a data center specialist and streaming video engineer. She also contributed to the development of Linux, Windows and ASP. From 2001 to 2006, prior to joining Ludicrous Ms. Woods was a network specialist for TV Bidder Software.

MIKE DAVIS, age 61, has been the Chief Operation Officer of Ludicrous since its inception in August 2007. From 1978 to present, Mr. Davis was a consultant with NASA, aerospace companies, and several government agencies. He has designed computer software systems that run naval vessels, military aircraft and NASA satellites. He has experience in computer communication and telemetry systems and real-time programming as well as systems architecture and design.

JAMES BLACK, age 55, has been the Chief Technical Officer of Ludicrous since its inception in August 2007. Mr. Black is the director of the technical sector of Ludicrous. He developed Ludicrous' Internet hardware platform. He has a wide range of hardware design and development in computer networks and he is experienced in advanced Internet networking and Internet operations center construction and maintenance. He also has experience in fiber optic network installation and he has developed and implemented an Internet relay station. Mr. Black was also a contributor to the development of the Microsoft Windows operating system as well as the Microsoft Office program suite. He has also contributed to the development of both Linux and Pearl. From 1990 to 1999, prior to joining Ludicrous Mr. Black was the computer science engineer of PRINE (Program Reactor Interfacing Network Engine) and from 1999 to 2007 he was the Development Officer of Movie Star Web.

JEFF FROST, age 22, has been the Secretary and a director of Ludicrous since its inception in August 2007. Mr. Frost is currently working on Ludicrous' Internet hardware platform. He has experience in computer networks, Internet networks, and server construction and maintenance. He has a background in computer graphics and computer audio systems with a specialty in integrating sound into computer programs. He also contributed to the development of the Microsoft XBOX and Sony Playstation gaming environments. From 2002 to 2005, prior to joining Ludicrous Mr. Frost was the Graphic Engineer of Movie Star Web.

DAVID REICHMAN, age 63, has been the Chairman of the Board of Directors of Ludicrous since its inception in August 2007 and the Chairman of the Board of Directors, Chief Executive Officer, and President of the Company since 2003. In 1970, Mr. Reichman, Manager-Budget & Cost, left American Express Company, for whom he had worked for five years, to form his own private consulting practice specializing in tax representation and business management.

**FINANCIAL INFORMATION FOR LUDICROUS**

The audited balance sheet for Ludicrous as of and for the two month period from inception through September 30, 2007 are included in Section 9(a) of this Report.

**AMENDED AND RESTATED ARTICLES OF INCORPORATION**

The Company plans to amend its Articles of Incorporation to, among other things, increase the authorized number of shares of common stock to 350,000,000 and to authorize 50,000 shares of preferred stock, as will be more fully described in the Information Statement on Schedule 14C, which the Company plans to file in November 2007. At a later date, the Company may also amend and restate its corporate bylaws.

4.

| 8-K | 5th Page of 8 | | TOC | 1st | Previous | Next | Bottom | | Just 5th |

SECTION 3. SECURITIES AND TRADING MARKETS

ITEM 3.02 UNREGISTERED SALES OF EQUITY SECURITIES.

See the description of the Agreement and Plan of Reorganization in Item 2.01 of this Report. In addition, for valuable services performed for the Company, the following individuals who are the directors of the Company were issued the following number of shares of the Company's common stock: David Reichman, 2,540,000 shares; Michael Vatis, 10,000 shares, Jon Gilbert, 10,000 shares and Frank Benincondo, 10,000 shares

SECTION 5. CORPORATE GOVERNANCE AND MANAGEMENT

ITEM 5.02 DEPARTURE OF DIRECTORS OR PRINCIPAL OFFICERS; ELECTION OF DIRECTORS; APPOINTMENT OF PRINCIPAL OFFICERS.

On November 1, 2007, the Company entered into an Employment Agreement with its Chief Executive Officer and President, David Reichman, effective October 1, 2007 (the "Agreement"). The Agreement has a term of two years, commencing October 1, 2007 and expiring on September 30, 2009. Mr. Reichman's annual salary is $250,000 and he has an automobile allowance of $2,500 per month. In connection with the Agreement, Mr. Reichman was granted 1,200,000 options to purchase 1,200,000 shares of the Company's common stock, vesting 1/24 on October 1, 2007 and 1/24 on the first day of each subsequent month over a 23 month period. The exercise price is $0.50 per share and the exercise period is five years from the date of grant. The stock options were granted under the Company's 2007 Omnibus Stock and Incentive Plan (the "Plan") adopted by the Company's Board of Directors on September 24, 2007, and subject to shareholder ratification. The Plan authorizes the issuance of stock options or other equity incentives covering the issuance of up to 6,000,000 shares of the Company's common stock.

A copy of the Employment Agreement is attached to this Report as Exhibit 99.2.

The terms of the Company's 2007 Omnibus Stock and Incentive Plan will be more fully described in the Information Statement on Schedule 14C, which the Company plans to file in November 2007. A copy of the 2007 Omnibus Stock and Incentive Plan is attached to this Report as Exhibit 99.3.

ITEM 5.06 CHANGE IN SHELL COMPANY STATUS.

See Item 2.01 of this Report.

SECTION 9. FINANCIAL STATEMENTS, PRO FORMA FINANCIALS & EXHIBITS

   (a)   Financial Statements of Business Acquired

        Audited Balance Sheet of Caddiccous, Inc. as of September 30, 2007.

   (b)   Pro Forma Financial Information

        None.

   (c)   Exhibits

        99.1   Agreement and Plan of Reorganization.*

        99.2   Employment Agreement with David Reichman, dated as of October 1, 2007.

        99.3   Tree Top Industries, Inc. 2007 Omnibus Stock and Incentive Plan.

        * Incorporated by reference from the Report on Form 8-K filed with the Securities and Exchange Commission dated October 19, 2007.

-5-

| 8-K | 6th Page of 8 | TOC | 1st | Previous | Next | Bottom | Just 6th |

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

TREE TOP INDUSTRIES, INC.
--------------------------------
(Registrant)

Date: November 5, 2007

/s/ David Reichman, Chief Executive Officer
-----------------
David Reichman, Chief Executive Officer

-6-

| 8-K | | 7th Page of 8 | TOC | 1st | Previous | Next | Bottom | Just 7th |

To the Board of Directors
Ludicrous Inc.
1011 N  Formosa Ave.
Pickford Building, #199
West Hollywood, CA 90046

We have audited the accompanying interim balance sheet of Ludicrous, Inc. as of
September 30, 2007 and the related statements of income and cash flows for the
period beginning July 31, 2007 and ending September 30, 2007. Our responsibility
is to express an opinion on these financial statements based on our audit

We conducted our audit in accordance with generally accepted accounting
standards on the cash basis of accounting.  These standards require that we plan
and perform the audit to obtain reasonable assurance about whether the financial
statements are free from material misstatement.  An audit includes examining, on
a test basis, evidence supporting the amounts and disclosures in the financial
statements.  An audit also includes assessing the accounting principles used and
significant estimates made by management, as well as evaluating the overall
financial statement presentation  We believe that our audit holds a reasonable
basis for our opinion.

In our opinion,  the financial statements referred to above represent fairly, in
all material respects the financial position of Ludicrous Inc. as of September
30, 2007, and the results of its  operations and its cash flows for the interim
period then ended in conformity with generally accepted accounting principles on
the cash basis of accounting.

/s/Shirley A. Bailey, CPA
-----------       ------
Shirley A. Bailey, CPA
Oct. 30, 2007

| 8-K | Last Page of 9 | TOC | 1st | Previous | Next | Bottom | Just 8th |
|-----|-----|-----|-----|-----|-----|-----|-----|

Ludicrous, Inc.
**BALANCE SHEET**
As of September 30, 2007

|  | Sep 30, 07 |
|---|---|
| **ASSETS** | |
| Current Assets | |
| Checking/Savings | |
| Sterling | 477,409.54 |
| Total Checking/Savings | 477,409.54 |
| Total Current Assets | 477,409.54 |
| Fixed Assets | |
| Equipment | |
| Computers | 6,036.62 |
| Total Equipment | 6,036.62 |
| Total Fixed Assets | 6,036.62 |
| Other Assets | |
| Security Deposit | 12,424.00 |
| Total Other Assets | 12,424.00 |
| **TOTAL ASSETS** | **495,870.16** |
| **LIABILITIES & EQUITY** | |
| Liabilities | |
| Current Liabilities | |
| Other Current Liabilities | |
| Due to T. Woods | 1,695.77 |
| Total Other Current Liabilities | 1,695.77 |
| Total Current Liabilities | 1,695.77 |
| Total Liabilities | 1,695.77 |
| Equity | |
| Paid in Capital | 500,000.00 |
| Net Income | -5,825.61 |
| Total Equity | 494,174.39 |
| **TOTAL LIABILITIES & EQUITY** | **495,870.16** |

Interim Audited Financials

**Dates Referenced Herein** *and* **Documents Incorporated By Reference**

| This 8-K Filing | Date | Referenced-On Page First | Last | Other Filings |
|---|---|---|---|---|
| | 7/31/07 | 7 | | |
| | 8/1/07 | 2 | | |
| | 9/24/07 | 5 | | |
| | 9/30/07 | 4 | 8 | |
| | 10/1/07 | 5 | | |
| | 10/19/07 | 2 | 5 | 8-K |
| | 10/30/07 | 7 | | |
| For The Period Ended | 11/1/07 | 1 | 2 | 3, 4 |
| | 11/5/07 | 5 | 6 | 3, 4 |
| Corrected On | 11/6/07 | | | 3, 4 |
| Filed On / Filed As Of | 11/7/07 | | | |
| | 9/30/09 | 5 | | |

Top                                                                 List All Filings

Filing Submission - Alternative Formats (Word / Rich Text, HTML, Plain Text, SGML, XML, et al.)

Copyright © 2008 *Fran Finnegan & Company  All Rights Reserved.*
www.secinfo.com - Thu, 19 Jun 2008 17:48:06.4 GMT - Privacy - Help

**TREE TOP INDUSTRIES, INC.: 8-K, Sub-Doc 1, Page 1**

⟨BACK⟩ ⟨PRINT⟩ ⟨CLOSE⟩

SECTION 1. REGISTRANT'S BUSINESS AND OPERATIONS

ITEM 1.01 ENTRY INTO A MATERIAL DEFINITIVE AGREEMENT

Effective October 19, 2007, Tree Top Industries, Inc. (the "Company") entered into an Agreement and Plan of Reorganization with all of the stockholders of Ludicrous, Inc., a Nevada corporation (the "Agreement"), pursuant to which the Company has agreed to acquire all of the issued and outstanding common stock of Ludicrous, Inc. ("Ludicrous") from the stockholders of Ludicrous in consideration for the issuance of a total of 68,000,000 newly issued shares of the Company's common stock, to be allocated among the stockholders of Ludicrous on a pro rata basis in accordance with their relative ownership of Ludicrous. Accordingly, after the closing of the stock exchange contemplated by the Agreement, which is expected to occur upon the completion of the audit of the financial statements of Ludicrous, Ludicrous will be a wholly owned subsidiary of the Company, and the prior shareholders of Ludicrous will be the majority shareholders of the Company. In the Agreement, the stockholders of Ludicrous have agreed to confer upon a designee of the Company, voting power over their shares of the Company's common stock acquired by them in the exchange for a period of two years or until the stockholder sells his Company's common stock in accordance with Rule 144 of the Securities Act of 1933, as amended, whichever occurs first.

Ludicrous, Inc. is a Nevada corporation formed on August 1, 2007 to engage in the business of the development and commercialization of technology for the telecommunications industry.

SECTION 9. FINANCIAL STATEMENTS, PRO FORMA FINANCIALS & EXHIBITS

ITEM 9.01(D) EXHIBITS

99.1 Agreement and Plan of Reorganization by and between Tree Top Industries, Inc., a Nevada corporation, and the Stockholders of Ludicrous, Inc., a Nevada corporation, dated as of October 19, 2007.

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

TREE TOP INDUSTRIES, INC.

-----------------------------------------

(Registrant)

Date:   October 19, 2007


/s/ David I. Reichman

-----------------------------------------

David I. Reichman, Chief Executive Officer

**TREE TOP INDUSTRIES, INC.: 8-K, Sub-Doc 2, Page 1** 

2.02(a). Certificates representing the Shares, duly endorsed or accompanied by stock powers duly executed in blank and otherwise in form acceptable for transfer on the books of the Company.

2.02(b). The stock books, stock ledgers, minute books and corporate seal of the Company (all other books and records of the Company being located in the Company's corporate premises).

2.02(c). Certificate from appropriate authorities as to the good standing of and payment of taxes by the Company.

2.02(d). The investment letters referred to in Section 8.01 hereof.

2.02(e). All other previously undelivered items required to be delivered by the Stockholders to the Buyer at or prior to the Closing.

2.03. DELIVERIES BY THE BUYER. At the Closing, the Buyer is delivering (unless previously delivered) the following:

2.03(a). To the Stockholders, (i) certificates representing 68,000,000 Buyer's Shares, in accordance with Section 1.02 hereof, and (ii) all other previously undelivered items required to be delivered by the Buyer to the Stockholders at or prior to Closing.

III.    RELATED TRANSACTIONS

3.01. There are no other related transactions.

IV.    REPRESENTATIONS AND WARRANTIES OF THE STOCKHOLDERS

The Stockholders hereby represent and warrant jointly and severally (except that in the case of Sections 4.01 and 4.02 hereof the representations and warranties contained therein are made severally by the Stockholders) to the Buyer as follows:

4.01. TITLE TO THE SHARES. Each Stockholder owns, and is transferring to the Buyer at the Closing, good, valid, and marketable title to the number of Shares set forth opposite the name of such Stockholder in Section 1.01 hereof, free and clear of all liens, claims, options, charges and encumbrances whatsoever.

4.02. VALID AND BINDING AGREEMENTS. As to each Stockholder, this Agreement constitutes the valid and binding agreement of such Stockholder, enforceable in accordance with its terms.
=================================================================================

ACQUISITION AND REORGANIZATION PLAN                                    PAGE 2 OF 10

**TREE TOP INDUSTRIES, INC.: 8-K, Sub-Doc 2, Page 2**



4.03. ORGANIZATION OF THE COMPANY.

4.03(a). The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Nevada and has the corporate power and authority to carry on business as presently conducted.

4.03(b). The copies of the Articles of Incorporation, and all amendments thereto, of the Company, as certified by the Secretary of State of Nevada and of the By-Laws, as amended to date, of the Company, as certified by its Secretary, which have heretofore been delivered to the Buyer, are complete and correct copies of the Articles of Incorporation and By-Laws of the Company as amended and in effect on the date hereof. All Minutes of the Company are contained in minute books of the Company heretofore furnished to the Buyer for examination and being delivered to the Buyer at the Closing, and no minutes have been included in such minute books since such examination by the Buyer that have not also been furnished to the Buyer.

4.03(c). The Company is licensed or qualified to do business as a foreign corporation in any jurisdiction in which it is required to be so licensed or qualified.

4.04. CAPITALIZATION OF THE COMPANY.

4.04(a). The authorized capital stock of the Company consists solely of 500,000,000 shares of common stock, $.001 par value, of which 68,000,000 shares are outstanding and 432,000,000 shares are held as treasury shares. All issued shares of the Company are duly authorized, validly issued and outstanding, fully paid, and non-assessable.

4.04(b). Except for the Shares, there are no shares of capital stock or other securities of the Company outstanding; there are no options, warrants or rights to purchase or acquire any securities of the Company.

4.05. SUBSIDIARIES AND AFFILIATES. Except for the securities identified on the Balance Sheet (as defined in Section 4.08 hereof), the Company does not own any capital stock or other securities of any corporation and has no direct or indirect interest, and since its incorporation has had no such interest, in any business other than the business presently directly conducted by it.

4.06. NO VIOLATION OF AGREEMENTS. Neither the execution nor delivery of the Agreement, nor the consummation of the transactions contemplated hereby violates or will violate, or conflicts with or will conflict with, or constitutes a default under or will constitute a default under any documents relating to the Company.

4.07. FINANCIAL STATEMENTS.

4.07(a). The Stockholders will deliver to the Buyer balance sheets ("Balance Sheets") of the Company as of September 30, 2007, and all of such statements will be audited by Buyer's auditors and a Consolidated Financial Statement prepared to file with the SEC.

===============================================================================

ACQUISITION AND REORGANIZATION PLAN                              PAGE 3 OF 10

**TREE TOP INDUSTRIES, INC.: 8-K, Sub-Doc 2, Page 3**



4.07(b). The Company hereby agrees to furnish to Buyer year-end AUDITED financial statements of the Company when completed by its auditors. The Company hereby agrees to use an auditor selected or approved by the Buyer for such statements. These year-end statements are due within forty-five (45) days following the end of the fiscal year. The format of such reports will be specified by the Buyer at the time of closing and may be subsequently changed by the Buyer, from time to time, by giving the Company thirty (30) days notice of such change.

4.07(c). The Company hereby agrees to furnish to Buyer quarterly financial statements of the Company. These quarterly statements are due within thirty (30) days following the end of a fiscal quarter. No quarterly financial statement need be provided for the last quarter of the fiscal year. The format of such reports will be specified by the Buyer at the time of closing and may be subsequently changed by the Buyer, from time to time, by giving the Company thirty (30) days notice of such change. The Company further agrees to provide monthly updates to these financial statements. These monthly updates may be in written, typed or printed form and will be provided within fifteen (15) days following the end of the month. No monthly financial update need be provided for the last month in a fiscal quarter. The Stockholders agree that the Company will pay to the Buyer, in an amount and on a periodic basis to be determined in the sole discretion of the Buyer, for as long as the Company is a subsidiary of the Buyer, management fees and cost reimbursements for Buyer's general management assistance to the Company, including but not limited to its assistance in facilitating financial and other reports by the Company, and its compliance with applicable securities laws, rules and regulations.

4.08. NO UNDISCLOSED LIABILITIES. Except as set forth on the Balance Sheets, neither the Company or its Stockholders know of any basis for the assertion of liabilities or against the Company not reflected on the Balance Sheets.

4.09. ABSENCE OF CERTAIN CHANGES. Subject to the most recent Balance Sheets, there have been no material adverse changes in the financial condition of the Company.

4.10. TAX RETURNS. The Company has duly filed all tax reports and returns required to be filed by it and has duly paid all taxes and other charges due or claimed to be due from it by federal, state or local taxing authorities.

4.11. TITLE TO PROPERTIES. Except as otherwise reflected on the Balance Sheet, the Company has good, valid and marketable title to all its properties and assets, real, personal, and mixed, tangible and intangible, including, without limitation, the properties and assets reflected in the Balance Sheet.

4.12. FIXED ASSETS. Schedule 1 lists the fixed assets of the Company. Furthermore, the Company warrants all such property to be in good condition or sound working order with no known defects. Furthermore, neither the Company nor any Stockholder has received any notification that there is any violation of any building, zoning, or other law, ordinance or regulation in respect of such property and to the best of their knowledge, no such violation exists.
=======================================================================

ACQUISITION AND REORGANIZATION PLAN                              PAGE 4 OF 10

TREE TOP INDUSTRIES, INC.: 8-K, Sub-Doc 2, Page 4                                   

4.13.  LEASES.  Schedule 2 lists any and all  leases  the  Company is a party  thereto.  The  Company  asserts  each said  lease is valid,  binding  and enforceable in accordance with its terms, and is in full force and effect.

4.14. PATENTS,  TRADEMARKS,  TRADE NAMES, ETC. Schedule 3 lists any and all patents, trademarks, trade names, etc. owned by, under license to or used by the Company.

4.15.  LITIGATION. The  Company  has  no  actions,  proceedings,  or investigations  pending or, to the best  knowledge and belief of the Company and the Stockholders, threatened by or against the Company.

4.16.   INSURANCE.   The   policies  of  fire,   liability,   workmen's compensation and product liability are in effect with respect to the Company and its  operations.  Schedule 4 lists all insurance  policies  currently in effect, including amounts, carriers, local agents, etc..

4.17. BANK ACCOUNTS. The Company bank account(s) are listed in Schedule 5 including bank, bank branch, account number(s) and current balance(s).

4.18. CONTRACTS AND COMMITMENTS.  Except as specifically  identified in the Balance Sheet,  the Company has no contracts,  commitments,  arrangements or understandings  that  are  material  to  its  business,  operations,   financial condition or prospects, other than the lease(s) identified in 4.13 above.

4.19.  CUSTOMERS AND SUPPLIERS.  At the Closing,  the  Stockholders are delivering to the Buyer a list of the names and addresses of the Company's three largest  customers and suppliers  that  accounted for more than ten percent  (10%) of the Company's sales or purchases, respectively, during the past two (2) month period.  The Company has not lost any customer or supplier whose name appears on such list.

4.20. COMPLIANCE WITH APPLICABLE LAW. The Company has duly complied. in respect of its  operations,  real property,  machinery and equipment,  all other property,  practices, and all other aspects of its business, with all applicable laws  (whether  statutory  or  otherwise),   rules,   regulations,   ordinances, judgments, and decrees of all governmental authorities (federal, state, local or other laws), including,  but not limited to, the Federal Occupational Safety and Health Act and all Laws relating to environmental  protection  and  conservation. Neither the Company nor any  Stockholder  has received any  notification  of any asserted present or past failure to comply.

4.21.  DISCLOSURE.  All  facts  material to all assets,  business, operations,  financial condition,  and prospects of the Company are reflected in the Balance Sheet, or have been disclosed  herein, or have been disclosed to the Buyer in writing. No representation or warranty by the Stockholders contained in this Agreement and no statement contained in any certificate,  schedule, list or other writing furnished to the Buyer pursuant to the provisions hereof, contains any  untrue  statement  of a  material  fact or omits to state a  material  fact necessary in order to make the statements therein not misleading.
============================================================================

ACQUISITION AND REORGANIZATION PLAN                              PAGE 5 OF 10

TREE TOP INDUSTRIES, INC.: 8-K, Sub-Doc 2, Page 5                                     BACK · PRINT · CLOSE

V.          REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer hereby represents and warrants as follows:

5.01. ORGANIZATION OF THE BUYER. The Buyer is a corporation duly organized, validly existing and in good standing under the laws of Nevada and has the corporate power and authority to carry on its business as presently conducted and to enter into and perform this Agreement.

5.02. AUTHORIZATION. The execution and delivery of this Agreement by the Buyer and the consummation by the Buyer of the transactions contemplated hereby have been duly authorized by the Buyer's Board of Directors or Executive Committee, no approval thereof by the Buyer's stockholders being required by law, and the Buyer is delivering at the Closing a complete and correct copy, certified by its Secretary or Assistant Secretary, of the relevant resolutions adopted at the meeting or meetings at which such authorization took place.

5.03. VALID AND BINDING AGREEMENT. This Agreement constitutes a valid and binding agreement of the Buyer, enforceable in accordance with its terms.

5.04. NO VIOLATION. Neither the execution and delivery of this Agreement nor the consummation by the Buyer of the transactions contemplated hereby violates or conflicts with the certificate of incorporation or by-laws of the Buyer or any agreement or other restriction of any kind to which the Buyer is a party or by which it is bound.

5.05. NO PREEMPTIVE RIGHTS. The stockholders of the Buyer are not by virtue of their ownership of the Buyer's common shares entitled to any preemptive rights or subscription privileges with respect to the Buyer's Shares to be issued hereunder.

5.06. AVAILABILITY OF REPORTS. The Buyer has made available to each Stockholder its Annual Report (10K) for the fiscal year ending December 31, 2006 and its Quarterly Reports (10Q) for the fiscal quarters ending March 31, 2007 and June 30, 2007.

5.07. VALIDITY OF THE BUYER'S SHARES. All of the Buyer's Shares being delivered hereunder are duly authorized, validly issued, and outstanding, fully paid and nonassessable, and are eligible (subject to official notice of issuance and compliance with Rule 144 of the Securities Act of 1933, as amended) for trading on the OTC Bulletin Board.

VI.         SURVIVAL OF REPRESENTATIONS; INDEMNIFICATION; SET-OFF

6.01. SURVIVAL OF REPRESENTATIONS. All representations, warranties, and agreements made by any party in this Agreement or pursuant hereto shall survive the Closing hereunder and any investigation at any time made by or on behalf of any party hereto.

6.02. STATEMENTS AS REPRESENTATIONS. All statements contained in any certificate, schedule, list, document, or other writing delivered pursuant
=============================================================================

ACQUISITION AND REORGANIZATION PLAN                                    PAGE 6 OF 10


hereto or in connection with the transactions contemplated hereby shall be deemed representations and warranties within the meaning of Section 6.01 hereof.

VII.     PROVISIONS REGARDING BUYER'S SHARES

7.01. REPRESENTATIONS BY THE STOCKHOLDERS.  Each Stockholder represents and warrants to the Buyer that it is his present intention to acquire the Buyer's Shares for investment and not with a view to the distribution or resale thereof, and is confirming such intention to the Buyer by letter simultaneously with the execution hereof.

7.02. AGREEMENTS BY THE STOCKHOLDERS.  Each Stockholder agrees that he will not offer, sell, transfer, assign, mortgage, pledge or otherwise dispose of or encumber any of the Buyer's Shares delivered to him pursuant to this Agreement (a) if such action would prevent the Buyer from accounting for the acquisition of the Shares as a "pooling of interests" and (b) unless (i) in the opinion of counsel to the Buyer or in the opinion of the Division of Corporate Finance (the "Division") of the Securities and Exchange Commission (the "Commission") expressed in a "no-action" letter (which letter and the request therefor shall be in form and substance satisfactory to counsel for the Buyer) registration of such shares under the Act, and the rules and regulations of the Commission thereunder, as then in effect, is not required in connection with such transaction; (ii) sale of the Buyer's Shares is permissible under Rule 144 of the Commission under the Act, in which event the Stockholder shall furnish the Buyer with an opinion of counsel (which counsel shall be reasonably satisfactory to counsel for the Buyer and which opinion shall be in form and substance reasonably satisfactory to the Buyer) the effect that the sale of the Buyer's Shares proposed to be sold is permissible under Rule 144, provided that the Buyer agrees to make such representations as may be reasonably requested by such counsel and that the Buyer can then accurately make concerning the Buyer's qualifications under Rule 144(c); or (iii) a registration statement under the Act is then in effect with respect to such shares and the purchaser or transferee has been furnished with a prospectus meeting the requirements of Section 10 of the Act.

7.03. LEGEND, ETC. Each Stockholder agrees that the Buyer may endorse on any certificate for the Buyer's Shares to be delivered to or on behalf of the Stockholder pursuant to this Agreement an appropriate legend referring to the provisions of Sections 8.01 and 9.02 hereof, and that the Buyer may instruct its transfer agents not to transfer any such shares unless advised by the Buyer that such provisions have been complied with.

7.04. VOTING TRUST.  Each Stockholder acknowledges and agrees that a person designated by the Buyer in writing prior to the Closing will have voting power over, and the right to vote, all of the Shares owned by the Stockholder on any matter for which there is a shareholder vote or consent by the Buyer, for a period of two years after the Closing or until the Shares owned by the Stockholder are sold in accordance with Rule 144 of the Act, whichever occurs first.

====================================================================

ACQUISITION AND REORGANIZATION PLAN                              PAGE 7 OF 10

TREE TOP INDUSTRIES, INC.: 8-K, Sub-Doc 2, Page 7



VIII.    MISCELLANEOUS

8.01. FURTHER ASSURANCES. From time to time, at the Buyer's request and without further consideration, each Stockholder will execute and deliver to the Buyer such documents and take such action as the Buyer may reasonably request in order to consummate more effectively the transactions contemplated hereby and to vest in the Buyer good, valid and marketable title to the Shares.

8.02. PARTIES IN INTEREST. Except as otherwise expressly provided herein, all the terms and provisions of this agreement shall be binding upon, shall inure to the benefit of, and shall be enforceable by the respective heirs, beneficiaries, personal and legal representatives, successors, and assigns of the parties hereto.

8.03. ENTIRE AGREEMENT. This Agreement, including the exhibits, schedules, lists and other documents and writings referred to herein or delivered pursuant hereto, which form a part hereof, contains the entire understanding of the parties with respect to this subject matter.

8.04. HEADINGS, ETC. The section and paragraph headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretations of this Agreement.

8.05. NOTICE. All notice, request, demands and other communications hereunder ("Notices") shall be in writing and shall be deemed to have been duly given if delivered or mailed (registered or certified mail, postage prepaid, return receipt requested) as follows:

        If to the Stockholders of the Company:

            To the address(es) set forth on Schedule A.

        If to the Buyer:

            Tree Top Industries, Inc. (TTII)
            c/o Richardson & Associates
            233 Wilshire Boulevard, Suite 820
            Santa Monica, California 90401

or such other address(es) as any party may have furnished to the others in writing in accordance herewith, except that Notices of change of address(es) shall only be effective upon receipt. All Notices shall be deemed received on the date of delivery or, if mailed, on the date appearing on the return receipt therefore.

8.06. COUNTERPARTS. This agreement may be executed simultaneously in several counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.
==============================================================================

ACQUISITION AND REORGANIZATION PLAN                    PAGE 8 OF 10

**TREE TOP INDUSTRIES, INC.: 8-K, Sub-Doc 2, Page 8** 

8.07. This Agreement shall be governed by and construed pursuant to the laws of the State of Nevada.

8.08. James Black and Mike Davis will be appointed as CTO and COO of the Buyer, respectively, and the Company will appoint two (2) directors to the Buyer Board of Directors at time of Closing. The Buyer will appoint two (2) directors to the Company Board of Directors at the time of Closing.

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the attached list of Stockholders of the Company (Schedule A) and by a duly authorized officer of the Buyer and Company on the date first written.

For the Buyer:                                              For the Company:

TREE TOP INDUSTRIES, INC.                                  LUDICROUS, INC.


By: /s/ David I. Reichman                                  By: /s/ Trisha Woods
----------------------------------                         ----------------------------------
       David I. Reichman, CEO                                      Trisha Woods, President

                                   Stockholders

/s/ Joe Davis                                              /s/ C.B. Davis
-----------------------------                              --------------------------------
Joe Davis                                                  C.B. Davis


/s/ W.L. Davis                                             /s/ M.R. Davis
-----------------------------                              --------------------------------
W.L. Davis                                                 M.R. Davis


/s/ Justine Reichman                                       /s/ Steven Hoefflin IRA
-----------------------------                                   RBC Dain Rauscher Custodian
Justine Reichman                                           --------------------------------
                                                           Steven Hoefflin IRA
                                                           RBC Dain Rauscher Custodian


/s/ L.G. Davis                                             /s/ Steven M. Hoefflin Trust
-----------------------------                                   UA Dated 8/20/1980
L.G. Davis                                                 --------------------------------
                                                           Steven M. Hoefflin Trust
                                                           UA Dated 8/20/1980


/s/ James Black                                            /s/ Paul Brownstein
-----------------------------                              --------------------------------
James Black                                                Paul Brownstein Trust

ACQUISITION AND REORGANIZATION PLAN                                        PAGE 9 OF 10

TREE TOP INDUSTRIES, INC.: 8-K, Sub-Doc 2, Page 9                    

Stockholders (cont'd)

/s/ Trisha Woods                              /s/ Russ Regan & Kent Jacobs, JT
------------------------------                -------------------------------
Trisha Woods                                  Russ Regan & Kent Jacobs, JT


/s/ Jeff Frost                                /s/ David Alvarado
------------------------------                -------------------------------
Jeff Frost                                    David Alvarado


/s/ S.M. Davis                                /s/ Elijah Black
------------------------------                -------------------------------
S.M. Davis                                    Elijah Black


/s/ H.D. Davis                                /s/ Heaven L. Needham
------------------------------                -------------------------------
H.D. Davis                                    Heaven L. Needham


/s/ Clive Davis                               /s/ Rudy Durand
------------------------------                -------------------------------
Clive Davis                                   Rudy Durand


=================================================================================

ACQUISITION AND REORGANIZATION PLAN                          PAGE 10 OF 10

Unless otherwise indicated and subject to applicable community property
laws, to the Company's knowledge each stockholder named in the table
possesses sole voting and investment power with respect to all shares
of Common Stock, except for those owned jointly with that person's
spouse.

(2)     Includes 150,000 shares of common stock which may be purchased pursuant
to stock options that are exercisable within 30 days of November 1,
2007. Includes 68,500,000 shares of Common Stock owned by 20 other
shareholders (Joe Davis, Wendy L. Davis, Justine Reichman, C.G. Davis,
James Black, Trisha K. Woods, Jeff Frost, Wendy L. Davis, Custodian for
S.M. Davis, Wendy L. Davis, Custodian for B.D Davis, Wendy L. Davis,
Custodian for Clive Davis, Wendy L. Davis, Custodian for C.B. Davis,
B.R. Davis, Steven M. Hoefflin Trust, Paul Brownstein Trust, Russ Hogan
& Kent Jacobs, David Alvarado, Elijah Black, Jr., Reaver L. Beechan,
Rudy Durand, and Steven Hoefflin) over which Mr. Reichman has voting
power for a period of two years from November 1, 2007 for all matters.
Does not include 3,550,000 shares of common stock issued to Mr.
Reichman in December 2007 for services rendered, or 250,000 stock
options granted to Mr. Reichman in December 2007 under the Company's
2007 Plan.

> May 8, 2008
>
> David Reichman <#>
> Tree Top Industries, Inc.
> 1041 N <#> , Formosa Avenue
> West Hollywood , Ca 90046
>
> David:
>
> I have always been open and honest with all of you. This
> continues
> despite all
> of your dishonesty. I would have never had my investigator
> go to this
> extent in
> investigating and exposing you and the others if it were
> not 100% just
> about
> you. You are a bad guy.
>
> Please read the email attachments and documents and provide
> the refund
> and
> rescission as directed.
>
> There is a tremendous amount of shocking information about
> all of you
> found on
> the internet <#> , Lexus-nexus, find law, etc. How
> would you ever think
> that no one
> would ever see what you and your group has done in the past
> and is now
> doing?
> The only ones that are really shocked and crushed by this
> information
> are really
> Pamela and I.
>
> Last night, after I recorded the afternoon meeting between
> you, Mike,
> Mark
> Richardson, Esq., and me, our investigator put all of the
> pieces
> together and
> presented it to us.  Pamela was involved in the conference
> call and
> just fell
> apart in grief. She just could not believe that
> "Barclay" and "Loretta"
> would do
> this to us and 'Barclay" would hug us in a prayer
> session at the end of
> a
> previous meeting at our home. This was one bad example of
> his poorer
> religious
> demonstrations.

>
> You don't seem to think logically. David, in our
> meeting of yesterday,
> why would
> you antagonistically suggest that I call Robert Shapiro
> <#> , Esq. to
> sue you and the
> company? Yes, I have a close friend who is a criminal
> attorney, Robert
> Shapiro <#> ,
> Esq. and has reviewed this material. Yes, a legal business
> expert,
> Robert
> Silverman <#>  Esq. has reviewed this material. You
> will be delivering
> our cashier
> checks to him. Yes, a senior attorney at the Christian,
> Miller, and
> Glaser <#>  Law
> firm has reviewed this matter. .Yes, the principle attorney
> and SEC
> expert at
> the Law firm of Quinn Emanuel Unquardt <#> , Oliver,
> and Hodges has
> viewed the
> material. Yes, a brilliant private investigator has been
> involved in
> this matter
> for some time now. Yes, a CPA and her book keeper have been
> involved
> for some
> time in reviewing this matter and the SEC materials. Yes, I
> and Pamela
> have
> spent countless hours on this matter. We decided that we
> would not lose
> our
> investment again because of corporate criminal
> activity-period. I
> don't need to
> start by suing you. The SEC and others can start this
> process on you by
> just one
> letter from me or my attorney. So, don't be so foolish
> to continuing to
> jeopardize the others as you have done. We will get our
> investment back
> one way
> or another. This way, you don't continue hurting the
> others.
>
>
>
> "Barclay" inferred that you would ruin this
> company and you have done
> it.
> Congratulations. He always told Pamela and I that the Feds
> would love
> to get him

> into prison again.. He failed to ever tell me that he was
> not the only
> one
> involved in these crimes. It also included Loretta, Joey,
> Mike, other
> friends,
> and family members that the Feds would like to put into
> prison.
>
> After just a short time watching you and the others, our
> investigator
> put this
> whole foolish repeat "penny stock fraud puzzle"
> together. It appears to
> them
> that your current actions are a clone of
> "Bio-Tech", CCIC <#> , etc.
> Those with
> permanent life injunctions are now back again as directors,
>
> manipulating TTII <#> ,
> and proabably <#>  Clearvision <#>
> International, Clearvision <#>
> public stock and attempting
> to increase the value with misleading and overblown
> information on "Net
> Thruster" and movie deals. We were enticed under these
> false pretenses
> to invest
> $1.1 Million. "Barclay" is back enticing
> investors to give him money
> based on
> creating his false appearance of wealth with bogus
> Picasso's, Loretta's
> bogus
> $1.5 Million dollar Trust Account purchase of stock, and a
> "Barclay"
> CVI <#>
> supported lifestyle (? IRS Problem for Joey). You are
> creating crazy
> SEC reports
> and overstating company hardware and goodwill assets (TTII
> <#> ), your
> erroneous and
> false SEC reports for TTII <#>  and probably the
> other 2 companies, and
> many other
> apparent improprieties are just exploding red flags. This
> whole group
> is just
> like an Ocean 11 and 13 gone terribly and stupidly wrong
> and you will
> never see
> it until it is too late.
>
> Rudy appears to be enticing the apparent DEA <#>
> and Jack Nicholson
> to make a movie
> without disclosing "Barclay's" record and

> ensuring that "Barclay" is
> not going
> to improperly entice investors to put up monies into this
> movie through
> Clearvision <#> or any other public Company. I
> certainly hope that
> Rudy has not
> given any of the DEA <#> stock or art in this
> company. The same goes
> for Joel Osteen <#>
> and others who need to be directly informed about both the
> judicial
> records of
> the people involved, the fake art and puffed up stock and
> the
> injunctions in
> place before anyone attempts to involve them.
>
> This is how the investigators and attorneys see it and now
> we obviously
> have to
> see it the same way. Let me repeat, we were both shocked
> at how
> "Barclay" and
> "Loretta", who we truly thought were our friends,
> improperly lured us
> into
> investing a lot of money.
>
> According to the P.I., it appears that all of you thought
> that you
> would make
> one last "great killing" and as
> "Barclay" use to say, "Retire and go
> off to
> Mexico." Again David, according to Pamela and I, Jim
> Black, Trisha,
> Brownstein <#> ,
> and others, you are the direct cause of the raised
> suspicions that have
> led to
> exposing this scam.
>
> Pamela and I really don't want to see anyone go to jail
> or go back to
> jail. I've
> seen enough of that through the last three corporate crime
> disasters. I
> don't
> want to have to testify in front of the Grand Jury again
> about people
> who I
> thought were my friends and turned out to be apparent cons.
>
> "Barclay's" history, as I have been told, of
> threatening to harm anyone
> who has
> information on him would be a very foolish act against
> Pamela or I.

> Therefore,
> these recordings, notes, documents, photos, and a letter
> from me are
> sitting in
> my attorney's office safe. No authority has yet to see
> this
> information. He is
> instructed to release all of this infomation <#>  to
> the authorities if
> anything
> whatsoever is attempted against us or if you go back on
> your agreement.
> Otherwise, it stays there.
>
> You and "Barclay" clearly stated that Pamela and
> I could have our
> investment of
> $1.1 Million with interest back at this time. We are
> demanding that you
> return
> this amount to us in cashier's checks placed in the
> hands of our
> attorney Robert
> Silverman <#> , Esq. before the close of business on
> May 27; 2008.We
> will specify the
> exact route and details on the following page.   I
> don't trust any of
> you. We
> will not sign any papers nor talk with or see any of you
> ever again.
>
> If there is any stock recission <#>  papers to sign
> then leave them and
> the cashier
> checks with Mr. Silverman <#> .
>
>
>
> Sincerely,
>
>
>
> Steven M <#> , Hoefflin, MD, FICS <#> , FACS
> <#>
>
>
>
>

> 
> 
> 
> 
> 
> 
> PERSONAL AND CONFIDENTIAL FOR SETTLEMENT AND REINBURSEMENT
> PURPOSES
> 
> May 27, 2008
> 
> To: Loretta Davis
> 
> From: Steven Hoefflin, MD.FICS <#> , and FACS
> <#>
> 
> RE: Answer to the questions in your recent letter.
> 
> Loretta,
> 
> You sent a recent letter. Other than filled with
> scriptures, you asked
> why
> Pamela and I have taken a "Position" with you,
> Merv (true name
> Barclay), and the
> others involved in TTII <#> .
> 
> I am going to answer your question in sufficient detail for
> you to
> understand
> "Our Position".
> 
> The following information is based on my opinion and
> belief. This is
> based on at
> least one witness statement and /or one public document.
> These
> statements are
> the result of your direct questions in the recent letter
> that you sent.
> I am
> forwarding this letter to "the others in TTII
> <#> " as you have
> included them in your
> question.
> 
> My statements are not meant to Slander or Defame or take
> away someone's
> freedom.
> All that Pamela and I have asked for from the beginning is
> Marv's (real
> name
> Barclay) and David Reich man's witnessed promise that
> they would return
> the $1.1
> Million dollars that we invested plus interest. I have
> given all of you

> sufficient time to, as David has stated to me to,
> "Find the money".
> Either we
> simply get the money back and are on our way to let all of
> you deal
> with your
> own severe problems. Or the other and more traumatic for
> you all, we go
> to the
> authorities, have all of you arrested, and obtain the funds
> through
> attachment
> of assets and disengorgement. This is what happened to you
> Loretta,
> Mervin <#> (real
> name Barclay), and others before.
>
> Loretta, I believe that these companies could have been
> very good for
> us and the
> investors. They turned out to be disasters because of bad
> people. In
> other
> words, I have never made a bad investment; I have only
> invested with
> Bad People.
> The group of you, due to your current crimes, have the
> definite
> potential the
> put this company out of business because you have not been
> honest in
> your
> representations in the SEC filings and elsewhere. To not
> reveal to the
> investors
> or participants such as Joel Osteen <#> and Jack
> Nicholson all of your
> criminal
> backgrounds would explode once they all found out. To go
> back to jail,
> which is
> a very high consideration would all sink the company. Not
> one of you
> flood people
> saw that and attempted toll protect the company and the
> innocent
> investors. It
> was primarily Davis's job to do that. But, due to his
> anti-social
> personality,
> pathological greed and cheapskate disorder, he colluded and
> conspired
> to carry
> on the criminal activities in hopes that no one would find
> out until he
> could
> "bump and pump" the stock, sell, and go away to
> Mexico.
>

> THIS IS SOLEY YOUR CHOICE
>
> Before I answer your questions, I would suggest that you
> read the
> following
> three things for your reference:
>
> (1)   Place Mervin <#> 's real name
> "Barclay Davis" into Google <#> .
>
> You can then read the thousands of detailed websites
> describing the
> "group of
> you, Merv, Joe Davis, Mike Davis, and others commission of
> multiple
> felonies by
> criminally taking money from innocent victims, your all
> multiple
> arrests,
> indictments, plea deals, permanent life restrictions on
> doing exactly
> what you
> have and are currently doing to innocent victims at this
> time, the
> threats, and
> Merv's as they say" ratting on the other criminals
> to decrease his own
> prison
> time. As you well know, you two turned "states
> evidence" and personally
> hired a
> PI to go to Switzerland to find and bring back one of your
> "associates
> in crime"
> so that he could be arrested and put into prison and you
> two could get
> a lighter
> sentence. Mervin <#>  "blew it" by
> attempting to hire two people to
> murder or
> severely injure his accountant and another investor
> scammer. This is
> the reason,
> as you know, that he went to prison for 30 months. This
> "ratting "got
> you off
> from prison time. They then "disengoroged you two of
> all available
> monies,
> several million dollars, to pay back the investors part of
> millions
> and
> millions  of dollars that you scammed them out of at that
> time".. It
> was
> published that you two headed the largest ring of criminal
> "Micro stock
> con
> artists" in the history of Nevada and Canada.

>
> By Mike Davis to threaten, obstruct Justice, and tamper
> potential
> witness Jim
> Black is an additional felony with additional person time.
> For David
> Reichman <#> to
> bring his criminal attorney from New York who previously
> represented
> him and to
> threaten Paul Brownstein <#> and chase off Jim
> Black and Tricia Woods
> is the same
> crime. To repeat the crime by calling Jim Black and stating
> "that if he
> met with
> me he would be shot in the face and stuffed into a
> bag" wins the prize.
> I
> already met for an hour with Jim Black, Tricia Woods, and
> Paul
> Brownstein <#> a few
> weeks ago. For someone, probably Mike Davis, to tap into
> his or my
> computer or
> tap a phone line to obtain that information was very
> foolish. All of
> these
> nothings can be easily traced, as can Rudy Durant's
> multiple email
> threats and
> impersonating a DEA <#> agent. Don't attempt to
> threaten Pamela or me
> as we have
> security.
>
> My additional planned meeting with Jim Black and Tricia
> Woods was for a
> completely different altruistic purpose. I had already met
> with Jim
> Black,
> Tricia Woods, and Paul Bronstein <#> for a long
> time before this call
> to stop Jim
> from visiting me or he would be shot in the face and
> stuffed into a
> bag. Bad
> call for whoever did it.
>
> (2)You can then Google <#> "The Psychopath-the
> mask of sanity" This
> will undoubtedly
> provide you with the diagnosis of most of your
> "partners in crime".
>
> (3)  Google <#> "Edgar Report". Type
> in TTII <#> or Treetop
> Industries and Clearvision <#>
> International, Inc. This will give you all of the

> fraudulent SEC
> Filings and
> accounting where Davis Reichman <#> committed
> felonies by placing
> false information
> in filings, such as backdating Rudy Durand <#> 's
> false association
> with the company
> in 2006 so that he could obtain stock without investing a
> dime, and
> possibly
> multiple false filings on Joe Davis's Clearvision
> <#> International
> SEC filings. .
>
> .
>
> . (A)DAVIS REICHMAN (May not is his real name):
>
> He is the obvious ringleader and investor money thief in
> the group. He
> has been
> characterized by the investigator as "The worst
> investment that any
> company can
> make". In addition the investigator stated that
> "He is worse than the
> bank
> robber that held up a bank and left his checkbook at the
> window. He
> also left
> his Photo ID Driving License, all of the criminal SEC
> filings, his cell
> phone
> number, his Bahamas bank account, and the name and phone
> numbers of all
> thieves
> in TT!! <#> "Ocean 13" members in
> crime." The problem is that David is
> so ill
> equipped to carry out a con job that he is probably the one
> that had
> the FEDS
> catch everyone in the first place several years going back
> to 2002 or
> further
> back. His biography is blank from 1975 to 2000.
>
> He may have also been in Jail. For David to state that I am
> the
> criminal just
> represents his mirror image psychiatric disorder.
>
> As an investor, when Pamela and I were first dined and
> wined to invest
> with
> David and Merv, David was sitting the end of the table at
> our first
> victim's

> dinners with "Your group" at the Beverly Hilton.
> He looked like a Hyena
> dressed
> in lambs clothing watching all of the potential investor
> victims as
> they passed
> by and were interviewed. At minimum these were the
> Heinz's, the Wrigley
> Gum
> Heir, and many others. David the money person in a criminal
> group is
> supposed to
> be in the backroom wearing a small cap and cooking the
> books under a
> writer's
> lamp. Instead, the group was foolish enough to put David
> into the
> driver's seat
> as the incompetent President and CEO of the group. My
> experienced
> Diagnosis, as
> others, is that David has an anti-social personality
> disorder. He has
> alienated
> everyone that he comes in contact with such as , Jim
> Black, Tricia
> Woods, Paul
> Brownstein <#> , many other employees, Pamela, I, and
> many others. He
> hasn't paid
> vendors that also were the reason for TTII <#> to
> get 5 lawsuits,
> judgments, and
> nonpayment of those judgments by David early on in the
> tragically
> mismanaged
> TTII <#> . With that alienation aroused much
> suspicion. In fact, David
> wows ate one
> that we the most suspicious and garnered the most attention
> for
> wrongdoing, Once
> his work was scrutinized it all stood out like he was
> wearing an orange
> prison
> jump suit. His pathological greed just stood out like a
> search light.
> Paying
> himself a 2.7 million dollar salary, repaying bad debt in
> his
> orioiginal TTII <#> (a
> bad company with a huge debt, 5 lawsuit judgments that were
> never paid,
> probably
> the association with previous crimes, and just the worse
> company to
> place
> Ludicrous into. was an attempt for him to "pay off his
> personal

> mismanagement of
> another company" prior to it joining Ludicrous in Nov
> 1, 2007.
>
> I asked David to simply explain what appeared to be
> "problems in his
> SEC
> filings, the accounting, etc. He became so pathologically
> angry and
> paranoid
> suspicious that he really outshined the ghost like white
> face of Mike
> Davis when
> he, David and I met with the "SEC attorney in crime
> (possibly), Mark
> Anderson.
> David directly answered my questions by lying and never
> asked whether I
> was
> recording his lies. His lies were obvious because I had the
> answers and
> proof
> sitting in front of me with a large 3 ring binder that he
> never
> foolishly asked
> about. I easily overheard and recorded his
> "conversation" between those
> three,
> how Mike Davis was paralyzed with fear that it was
> uncovered that David
> actually
> entered his position as COO in a TTII <#> public
> company, Mike Davis's
> fear was ..
> that one life long and unconditional Department of Justice
> order with
> his
> criminal sentencing, like that of you, Mervin <#>
> (Barclay) , Joe
> Davis, an others,
> was to not act as a officer and/or director of a public
> company. Well,
> there was
> Mike Davis's name in the SEC fillings as "COO of
> Tree Top Industries,
> Inc, a
> public company and other violations".
>
> As TTII <#> SEC Attorney Mark Anderson,Esq..,
> Mike Davis, and Davis
> Reichman <#> sat in
> the conference room looking at Davis's SEC filings,
> it became so
> obvious that
> there were falsifications and felony misrepresentations
> that silence
> fell over
> everyone yet David started to lie as we looked at the false
> accounting

> picked
> them out page by page. For David to lie to my face about
> those filings
> when I
> had those criminal entries underlined and professionally
> reviewed
> sitting in my
> three wing binder was another example of his incompetence.
> I truly do
> not
> understand how Mark Richardson, Esq. could have let these
> exist and not
> modify
> these entries himself. My stepping out of the room then
> overhearing and
> recording their conversation was quite enlightening.. My
> revelation to
> him that
> I was not recording the meeting was easily accepted and
> then he became
> even more
> careless with David.
>
> For David to sit in the hotel room with Pamela, I , Merv
> (Barclay),
> and you and
> reveal to us " not to discuss Marv's leadership in
> obtaining funds from
> the
> innocent investors" was a raised red balloon  by
> David that continued
> to grow
> and grow and grow until he has now popped it in right in
> front of
> everyone's
> face. Merv called David "just a bean counter (Pea
> Brain) saying that he
> doesn't
> know how to run a company and I do it" begs the
> question, why did Merv
> bring him
> out from New York in the first place?"
>
> By David sending documents and emails across state lines,
> especially
> those
> documents that had only he and Loretta listed as in New
> York when both
> were in
> the company based in Los Angles was another red Balloon.
> For Davis to
> give you
> 20 Million shares of stock off the bat when it was obvious
> that you
> didn't
> invest a cent, you and Merv planned that without showing
> Marv's
> participation
> was another red balloon. But for him to give Justine 8

> Million shares
> just to
> add to his shares implicates her. He attempted to show his
> own poor
> accounting
> by telling investor there were investor monies to repay the
> old debts
> in Tree
> topic before November 1, 2007 was a fraudulent activity and
> Prison
> stripped red
> balloon. The balloon popped when he placed himself as the
> total
> controller and
> then beefed up his own holdings in a poorly filed SEC
> reapplication. He
> gave
> himself millions of extra shares, stock options, and he
> controlled the
> date and
> decision to allow people to saltier stock and get out of
> town or out of
> the
> country. This is called a flight risk. David Alienated Jim
> Black and
> Tricia
> Woods so much that it became obvious to them that the
> company was
> headed towards
> the dumps, and would never hold up to Government scrutiny.
> They knew
> that the
> stock would soon be worthless so they turned back 25
> Million shares
> which were
> worth 250 million dollars. David told me that he was happy
> about that
> turn back
> because it just increased the value of the remaining
> investor stock
> shares,
> especially of those that would be impressed. Little did
> David know how
> he was
> manipulating the stock value all along? You could easily
> calculate that
> David's
> bumped up the market value of TTII <#> to a market
> cap of 1 billion
> dollars when it
> had no income. He manipulated his part to be more valuable
> by placing
> his prior
> TTII <#> with a 15 Million dollar debt and. Later
> he was to take that
> amount out
> when he could sell the restricted shares. That is in the
> probably strep
> that he

> put all of the unpaid lawsuit judgments in TTII <#>
> prior to creating,
> as he said" a
> new Company" in his TTII <#> SEC filings. Then
> he could reap more ill
> gotten funds
> by reimbursing himself by illegal fund
>
> Pamela and I invested $ 500 Thousand Dollars into Ludicrous
> in
> September, 2007
> and $600, 000 into TTII <#> in March, 2008. It is
> quite revealing that
> David just
> recently sent me the stock certificates for just the $600,
> 000 and left
> out the
> $500,000 stock certificates. In looking at his SEC
> accounting, it
> appears that
> this is part of our "missing" monies. David
> pocketed the money, flew to
> the
> Bahamas telling people that he was going to New York, or
> pocketed the
> money
> himself and cooked the books so it looked like we only
> invested
> $600,000.
> Possibly he paid himself a portion of his $2.7 Million
> dollar salary
> when there
> was no company income, or other criminal activity. His
> criminal
> attorney that he
> had fly out from New York can check into that fact. Most
> amazing is
> that,
. > despite the 2002 Oxley act Law, etc.put into place by Bush
> after Enron,
> et al,
> he then made the invested funds apparently disappear and
> then refused
> to show me
> the accounting. He stated very clearly in front of lawyer
> Mark
> Richardson, Esq.
> that he didn't have to show me accounting, resulted in
> the attorney for
> TTII <#> ,
> Mark, to turn white. Little did David know that he gave me
> his
> accountants name
> in Utah and a call to him, by law, immediately results in
> the full
> accounting
> being sent to me by email today?
>
> Now everyone can see why David Reichman <#> had to

> ask his criminal
> attorney, who
> readily revealed that he has represented David before, to
> immediately
> fly out to
> Los Angles. There is an abundant amount of information in
> the red
> balloons that
> is available for his criminal attorney to look at when
> David's balloon
> pops over
> the attorney's head.
>
> (1)  Loretta and Mervin <#>  (Barclay) Davis.
> Both of you have been
> previously
> described as "The Bonnie and Clyde" of the
> fraudulent penny stock
> scammers <#> .
>
> Loretta, you have been arrested, indicted, and pleaded
> guilty to
> several
> felonies. You have been restricted for life from
> essentially
> participating in
> more investor victimization yet you appear to be doing that
> right now.
>
> You always called Merv "Barclay. I didn't
> understand why until I found
> out that
> his name was really Barclay and you were cooperating; in
> the fallacious
> name
> change. When my investigator was doing a background check
> on Mervin <#>
> , nothing
> showed up. When his real name "Barclay" was
> investigated, hundreds of
> pages of
> documents, articles, and other materials were found. You
> two have truly
> been the
> Bonnie and Clyde. Of the penny stock scammers <#> .
> You have definitely
> participated
> in other crimes and were arrested, indicted, pled guilty,
> and then had
> a reduced
> sentence when both you and Merv hired a investigator to
> find one of
> your
> partners in Switzerland, brought him back to Nevada, ratted
> on him, and
> then
> obtain a reduced sentence.
>
> Despite your lifetime restrictions, Loretta you are doing

> the same
> thing time
> after time and getting caught. My attempts to warn you by
> walking
> around the
> outside of your house and asking to meet with your attorney
> so we could
> "ensure
> that you and Merv were not violating the law", was my
> attempt to help
> you. You
> refused. Then when David started blowing up his red
> balloons I came
> back
> several times with Merv to tell him that he was again under
>
> investigation and
> should stop his activites, and he just refused to
> acknowledge this
> potential
> problem. And said that he was "doing everything
> right". When I told him
> that
> after his investigation by participating in Investor fund
> raiding in
> Joe Davis's
> Clear visional International public company, he was again
> under a
> additional
> investigation, he told me that he know it but that
> "God would protect
> him". His
> obtaining a website <#> for Joel Osteen <#>
> was actually Jim Black's
> and not Marv's
> idea. Jim already had a religious website <#> for
> quite a period of
> time.
>
> As you can see from reading the above referenced book,
> Merv has a very
> serious
> personality disorder called anti-social Psychopath. David
> suffers from
> the same
> thing so "birds of a feather fly together". He
> doesn't recognize the
> serious
> crimes that he is committing that hurt innocent investors.
> He is only
> focused on
> making money anyway that he can do it. The previous
> Untitled States
> Criminal
> Prosecutor had found out that Merv has never held a job
> back to at
> least 1984.
> He was probably a "Con-Boy" and he was arrested
> as an adult in 1990.

> Both of you
> two never showed up for court and fled to Mexico. It
> appears, with a
> current
> investigation, that you were doing the same scamming in
> Mexico. They
> caught you
> doing it in Canada, New York, Virginia, New Jersey, and
> Florida. They
> ever
> determined that you had millions stashed in Bahamian banks
> and recorded
> Merv as
> stating that all he had to do was to make one call, wire
> funds to your
> account,
> and pay for anything he wants right under the nose of
> "The Fads". There
> was
> evidence that "your scam group" had taken an
> estimated 100 Million
> dollars from
> innocent investors. When you two "ratted" on the
> others, they repaid
> and
> disgorged funds from you and them. You two made millions of
> dollars but
> lied on
> your 2003 bankruptcy fining when you sold your 4 Million
> dollar home to
> Goldstein and kept artwork with your relatives. You showed
> it to me in
> the guest
> house in your rented home.
>
> Again, You, Merv, David, Rudy, Joe, and the rest of the
> "Scam Gang" sat
> around
> the Beverly Hilton Hotel's "victim interview
> dinner table" showing off
> great
> wealth when all of you actually had no money. Merv and you
> showed off
> all of
> your Picasso art that is actually, according to my expert
> "really bad
> fake
> copies". By Merv showing Pamela a fabricated appraisal
> and sales slip
> indicating
> that artwork he gave us was worth $1.1 million dollars was
> very foolish
> when my
> Picasso expert said that it was essentially worthless as a
> piece of art
> because
> it was such a bad fabricated copy that anyone that knows
> art could spot
> it as a

> fake across the room. When the "bad copy" of a
> Picasso piece that you
> gave us
> had a fake authentication sticker of the back it became
> obvious that it
> was
> purchased, probably by David, in New York. The name never
> existed, the
> New York
> Art Gallery never existed, and the artwork was a fake. Merv
> and Loretta
> I'm sure
> you are saying "Good job cheapskate David"
>
> Unfortunately, you have given this fake artwork to Joel
> Osteen <#> ,
> apparently to
> Jack Nicholson, and other "potential inventor victims
> or participants"
> in the
> TTII <#>  Company. Didn't both of you ever
> realize that just by them
> getting an
> insurance policy would raise the need for a appraisal and
> that that
> someone
> would pick this up?
>
> Your, Merv, and David's false face of wealth to bait
> innocent investors
> was good
> until you over did it. By both of you and David to state
> that the
> Malibu home
> was yours and then to rent it out was quite suspicious. To
> pump your
> false
> wealth by introducing everyone to the fake Picasso art in
> your home now
> explains
> your motivation. For you, Merv, and David to state that you
> bought
> Bentley's
> when they are actually leased by Joe's company is quite
> relabeling. For
> David to
> live in the Beverly Hilton is quite revealing. For Mervin
> <#>  to wear
> sunglasses at
> night pretending that he was Jack Nicholson was quite
> revealing and
> showed a
> little bit of his personality disorder.
>
> Loretta, for you to discuss your wealth with Pamela, that
> you owned 20
> million
> shares of TTII <#>  then worth $200 Million
> Dollars" when you didn't

> invest a dime
> yet Merv told Pamela and I that you invited $1.5 from your
> "Trust" is
> stock
> fraud.
>
> For everyone to get their attonereis involved in this scam
> is foolish
> as they
> need to recues themselves and get their own attorneys. Mark
> Richardson,
> Esq.
> told Mr. Silverman <#> on the phone that he and
> David would pay is
> black by
> obtaining money from other new Investors. This is stock
> fraud and a
> Ponzzi
> scheme. He and David obviously saw and possibly covered up
> some of the
> problematic SEC filings and accounting. David flew his own
> criminal
> attorney in
> from New York and had him harass and tamper with witnesses
> Paul
> Brownstein <#> and
> Jim Black. Rudy had David Krause-Leemon <#> write a
> threatening legal
> letter to me
> containing known false facts. There is no $1.5 Million
> dollars invited
> by Merv
> in a non-existent script. Jack Nicholson has not signed up
> for the
> movie DEA <#> . In
> fact, he told me over dinner at the opening of the Disney
> Hall that he
> would
> lever sign anything with Rudy. The movie is not in
> Production and is
> not
> expected to earn 100 Million dollars.  Mervin <#>
> trying to get
> investor money for
> "Bottle shock"tht was produced through a publicly
> company is a
> violation of his
> court order. He, despite misrepresentations, did not
> produce or have
> anything to
> dud with the making of this film.
>
> Like David, I do not remember one thing that Merv or Davis
> has told men
> that is
> true. It is difficult for both of them to tell the truth.
> Normal people
> have
> difficulty in telling a lie. They have great difficulty in

> telling a
> truth. This
> is like a sites inverse of her brain where they brain tells
> them to
> doff the
> opposite.
>
>
>
> I could go on and on.
>
> Again, all that Pamela and I have asked for is the promise
> be kept by
> Merv and
> David that they will return our $1.1 Million dollars
> investment with
> interest.
> We have not as yet gone to the authorities. All of the 8 ½
> pounds of
> documents,
> recordings, witness statements, notes, etc.are sitting with
> my attorney
> and
> another site. Instruction letters are there to send it to
> the
> authorities which
> are the judge that just made an agreement with Merv in
> December 2007
> after his
> criminal acts in Joe's company Clearvision <#>
> International. We will
> also send it
> to each Unitized States Prosecuting Attorney who dealt with
> all of you
> guys.
>
> You can contact Mr. Silverman <#> at (818) 606-2818
> to make
> arrangements for the
> directed payment. There will be no delay or negotionations.
>
> Steven M <#> . Hoefflin, MD, FICS <#> , FACS
> <#>
>
> Cc: Robert Silverman <#>
>
> ======================================
>
>
>

> 
> 
> 
> 
> June 4, 2008
> 
> 
> 
> The Securities and Exchange Commission
> 
> 5670 Wilshire <#>  Boulevard
> 
> 11th Floor
> 
> Los Angeles , California 90036-3648
> 
> 
> 
> Dear Sirs:
> 
> 
> 
> I, and a potential government witness, James Black, have
> had our lives
> threatened and both of us have had to go into hiding. James
> Black is
> hidden up
> North and still receiving Death Threats. He made a
> telephone call to
> me at  ·
> 9:45am, stating a man with a New York accent said "if
> you don't stop,
> in 24
> hours, you will be dead".  I have had similar calls.
> 
> 
> 
> The Davis Family Penny Stock Swindling team,  and a few
> other
> associates in
> crime, are back at work now in West Hollywood swindling
> innocent
> investors both
> "Pumping and Dumping" stock in a public company,
> Tree Top Industries,
> (TTI| <#> ) and
> using bogus movies as bait.  All of the Department of
> Justice, FBI and
> previous
> SEC criminal filings can be found by placing "Barclay
> Davis" and then
> "Tree Top
> Industries, Inc" into the Google <#>  Search
> Engine or Lexis-Nexis.
> 
> 
> 
> (a)    Barclay Davis (Alias name Mervin <#> ):
> Multiple Convicted

> Felon, released
> from Federal Prison two yeas ago, currently on probation,
> restricted
> for life
> from acting as a director and officer of a public company
> and "Pumping
> and
> Dumping Stock". He has violated his parole,
> restrictions, and is
> currently
> participating in multiple criminal activities. He has
> returned to
> threatening
> the life of future government witnesses: Steven Hoefflin,
> MD, James
> Black,
> Trisha Woods, Paul Bronstein <#> , and others.
>
> (b <#> )   Loretta Davis (the wife): Multiple
> Convicted Felon and
> restricted for life
> from acting as an officer and director of a public company
> and "Pumping
> and
> Dumping Stock'. She has violated her restriction and
> has knowingly
> participated
> with Barclay in swindling innocent investors.
>
>
>
>
>
>
>
>
>
> \
>
> (c)   Mike Davis: Barclay's brother. Multiple
> Convicted Felon who is
> restricted
> for life from acting as a director and officer of a public
> company. He
> is the
> COO of Tree Top Industries, Inc, a public company.
>
> (d)   David Reichman <#> : financial swindler with
> a criminal history
> whose now
> President and CEO of Tree Top Industries, Inc.
>
>
>
>
>
>
>
>

>
> They are participating in two groups of Criminal Felony
> Activities:
>
>
>
> (1)  Penny Stock Swindling: Tree Top Industries, Inc
> (TTII <#> )  This
> is a long
> existing dirty company owned by swindler David Reichman
> <#> . He
> started his career
> out in 1978 by turning in, with his then wife Sue, 125
> bogus
> chiropractor bills
> to his insurance company. In November 2007, all of the
> above referenced
> criminals, under the complete 'behind the scenes"
> leadership of Barclay
> Davis
> took a misrepresented technology "Net-Thruster"
> created by James Black
> (innocent
> party) and started a non-public company,
> "Ludicrous" to hide initial
> investor
> monies. They then 'reverse merged" this company
> into David Reichmann
> <#> 's TTII <#>
> Public Company that already had fabricated $15 Million
> dollar losses
> without any
> historical products or activities. He had 6 previous
> lawsuits and
> judgments that
> went unpaid. He fabricated false SEC filings with attorney
> Mark
> Richardson, Esq.
> and false accounting. He backdated Rudy Durand <#>
> 's participation to
> 2006 so he
> could receive stock. He gave Loretta Davis 20 Million
> shares which were
> actually
> for both Loretta and Barclay. He paid himself a 2.7 Million
> dollar
> salary per
> year. etc.
>
>
>
> (2)  Fabricated Hollywood Movie Swindling:  "DEA
> <#> ". A bogus movie
> about the Drug
> Enforcement Agency The above referenced group, under the
> direction of
> Rudy
> Durand <#> , created a bogus movie with big movie
> stars such as Jack

> Nicholson (who
> told me he would never sign on with Rudy Durand <#> )
> and others to
> create
> credibility. Either the four DEA <#> agents are
> duped, or they are
> imposters who are
> participating in this scam. Rudy Durand <#> has one
> movie flop to his
> name made in
> 1979. He is also using a recently completed script called
> "Younger" to
> attract
> investors. The problem is that he financed that script 16
> years ago and
> it went
> no where, unless possibly as a means stealing innocent
> investor's
> money. He
> enticed large inventors and then tells them that "The
> Movie just didn't
> work
> out, sorry". They pass the investment monies through a
> laundering
> process,
> including off shore, and then back into their own pockets.
>
>
>
> Barclay Davis, once released from Federal Prison, went to
> work with his
> convicted felon son (Joe) at his Hollywood scam studio,
> Clearvision <#>
>
> International. They took investors, yet one returned with
> guns,
> demanded his
> money back, gave back Barclays false Picasso art that he
> gives out as
> "collateral". Barclay was rearrested in late
> 2007, pled, and was given
> an
> extended probation. He just moved his movie company next
> door, changed
> the name
> to Clearvision <#> Productions, and started all
> over again with
> everyone
> participating under a different name.
>
>
>
> Barclay Davis has returned to threatening the lives of
> those that may
> participate in these crimes. He was previously caught
> planning to kill
> witnesses
> by FBI wire taps in 2002. He told James black that he had
> two people

> "bumped
> off" in Arizona .
>
>
>
> Those individuals are:
>
>
>
> (1)  Myself, Dr. Steven Hoefflin. My wife and I invested
> $500,000 in
> Ludicrous/TTII <#>  in September, 2007 and $600,000
> in March, 2008.
> Loretta Davis was
> a 12 years patient of mine and never told me anything about
> her felony     ·
> conviction. She asked me to take my child education movie
> concept
> ."Little Dizzy
> Egghead and His Brain Train Adventures" to her husband
> Barclay. Once I
> became
> suspicious of their activities approximately 3 weeks ago, I
> pulled the
> script
> from them. I invested heavily because they convinced me
> that they had a
> technology that would allow me to place laptop computers,
> my child
> education
> programs, and video recording of children in any part of
> the world.
> This is a
> false representation. I have had my life threaten by phone,
> threatening
> letters
> by fax and email from Rudy Durand <#> , they
> apparently arranged to
> have me falsely
> arrested at LAX by two participating LAX police officers,
> and had a gun
> man ·
> threaten to kill me in Acapulco . Both Barclay Davis and
> David Reichman
> <#>  promised
> that they would reimburse our investment of $1.1 Million
> dollars,
> expected by
> May 27, 2008. They refused stating that they had to wait
> until they
> could sell
> more TTII <#>  stock to other investors and then
> they would pay us
> back. Mark
> Richardson,Esq. participated in that phone call witnessed
> by my
> attorney, Robert
> Silvaerman,Esq.
>

> (2)  James Black: He brought a technology to Barclay.
> They used the
> name but
> never developed the technology. At this time, they are
> attempting to
> swindle the
> evangelical Christian ministers, such as Joel Osteen
> <#>  and many
> others. When Jim
> Black discovered the scam in March, he left, turned back in
> 25 Million
> of
> worthless shares and left. He has had his life threatened
> by Mike Davis
> and
> others.
>
> (3)  Trisha Woods: She is the Girlfriend of Jim Black.
> Mike Davis
> threatened
> her. She has also had threats along with Jim.
>
> (4)  Paul Brownstein <#> . He was an employee at
> Clearvision <#>
> productions and saw all
> of the fraud. His father has invested in the company but is
> under the
> direction
> of the financial person, criminal David Reichman <#>
> . Paul's life was
> threatened any
> he separated himself from Jim Black.
>
>
>
> I have a very large number of documents and current
> allegations of the
> Davis
> Family and their accomplices in crime.
>
>
> .
> They, especially Barclay, are an immediate flight risk as
> he fled to
> Mexico
> several years ago and was arrested in 1994.
>
>
>
> I have reported the threats to the West LA Police
> department, without a
> strong
> interest. I reported this matter to the FBI, also without a
> strong
> interest.  I
> and the other inventors and those threatening are hoping
> that you will
> show
> stronger interest to help us.

```
>
>
>
> I am also a registered candidate for the Presidency of the
> Unlined
> States. I am
> entering the race on or around June 15, 2008. Many of my
> friends who
> are
> concerned about our country but specifically the potential
> for Senator
> Clinton
> to pass a very bad Universal Health Care plan that could
> destroy the
> number one
> position of American Medicine in the world, have requested
> that I run.
>
>
>
> Sincerely,
>
>
> .
>
>
>
>
> Steven M <#> . Hoefflin, MD, FICS <#> , FACS
> <#>
>
> President and Founder
>
> The Gloria Hoefflin International Child Education
> Insitutaarte and the
> David
> Hoefflin Child Educational Research Center
>
>
>
>
>
> ========****=========**========
>
>
```

>
> Dear Mr. Krause-Leemon <#> :
>
> As I told your secretary and I wrote to you yesterday, by
> choice, I am
> not
> represented by a attorney at this time. Respectfully, I
> have the legal
> right to
> represent myself and for you to correspond directly with
> me. I do not
> want to do
> this, but if you do not respect my position, then I have
> the right, as
> I have
> successfully done before, to report you to the California
> Bar for
> unprofessional
> activities and violating the Codes of Civil Procedure. You
> cannot
> professionally
> have this matter up in the air due to my upcoming blind
> trust.
>
>
>
> This morning I received a very disturbing piece of
> information from my
> investigator about you and your firm. If true, this
> indicates that you
> know that
> Barclay Davis is violating his court ordered lifetime
> restrictions on
> activities
> in or around public companies, that the information
> contained in your
> letter has
> not been documented properly and is mostly false, that
> there is another
> Davis
> SEC/Department of Justice Investigation at this time, and
> that your
> letter and
> its misrepresentations can be taken as possible Obstruction
> of Justice.
> If you
> would like me to put all of the reasons and evidence down
> in a email to
> you,
> then request it.
>
> Your letter to me of May 16, 2008 was reviewed by the
> investigators. I
> have
> been told the following information and I have requested
> more backup
> which I
> will provide to you. This is information that is my or my

> representative's
> opinions:
>
>
>
> Your client Mervin <#> Davis is a alias for Barclay
> Davis. In your
> threatening  me
> with a legal notice, you have not used his proper name .
> This must be
> corrected
> in your communication to me. Barclay Davis has been
>  indicted by the
> SEC ,
> Department of Justice, and several other agencies on at
> least 2 or more
> occasions. You know him and have defended him in one or
> more of these
> actions,
> especially in  2002, SEC vs. Barclay Davis re: The New
> Energy,Inc.
> Litigation..
> Therefore, you know that certain activities that he is now
> participating in are
> violating his court ordered restrictions. To not be aware
> that there
> are
> probably dozens of United States attorneys who would like
> to put he and
> anyone
> else even remotely associated with his activities away in
> prison is
> foolish. As
> his attorney, just look who he is endangering including
> you. I was
> engaged by
> him as a medical consultant on the DEA <#>  film.
> For me to see these
> irregularities
> including his misrepresentations of wealth and untruths to
> attract
> investors,,
> for me to have met with the DEA <#> , for me to have
> talked with Jack
> Nicholson, and
> then let the irregularities stand without a response from
> me would
> equally be
> improper. As a lawyer, you know that this is  the proper
> stance. For
> your
> clients to continue to engage in their activates without
> your
> counseling them
> would be malpractice on your part.
>
>
>
> In December 22, 1997,in a US Department of Justice

> sentencing "Summary"
> from
> Daniel Bogden <#>  The United Statues Attorney
> stated that  Barclay
> Davis pleaded
> guilty to a felony charging him with Conspiracy to commit
> securities
> fraud and
> bank fraud, money laundering, and criminal forfeiture.
> There were
> specific
> orders prohibiting he and several of his other
> conspirators, including
> his wife
> and son, from permanently and unconditionally
> "acting" as a officer and
> director
> of any publically <#> held company. Again, he is
> currently "acting as
> a director and
> officer of TTII <#> " even though it is not down
> on paper. There are
> potential
> office and investor witnesses and there is potential
> testimony in
> front of a
> Grand Jury under oath that can easily prove this violation.
> You have
> witnessed
> his untruths personally and know what I am telling you.
> There were two
> additional SEC Litigation Records including Accounting and
> Auditing
> Enforcement
> Release No. 1079/September 24,1998 involving not only
> Barcly <#>  Davis
> but also
> Joey Davis, Loretta Davis, Mike Davis, and other
> defendants. Joey Davis
> was a
> principle in Clearvision <#>  International,Inc ., a
> public company. He
> also appears
> to be violating his court order.
>
>
>
> Your client  Barclay Davis was apparently implicated again
> in late 2007
> in his
> involvement in violating his permanent order not to be
> involved in
> raising money
> or participating in  the selling of microcap <#>
> stocks. Apparently
> there were two
> men that entered Clearvision <#>  International
> offices with guns and
> demanded that

> Barclay return fraudulent art and reimburse their
> investment. This
> involved his
> association with Joey Davis who was also convicted and
> permanently and
> unconditionally barred from "acting' as a officer
> and director of a
> public
> company. He is also restricted from raising money or
> selling stock in a
> public
> company. Both he and Mike Davis know that they have
> violated their
> restrictions.
> There are witnesses and this is factual despite their
> denial.
>
>
>
> Subsequent to this violation, your client Barclay Davis
> formed
> "Clearvision <#> :
> which appears to be a "Alter-Ego" of Clearvision
> <#> International.
> Apparently ,
> They a went from the Energy and other microcap <#>
> to the movie
> industry. Joey's
> company's website <#> and SEC filings are
> filled with fraudulent
> misrepresentations. Barclay and others were instrumental
> in forming
> Ludicrous
> and then doing a reverse merger into a very poorly
> performing and
> unreputable <#>
> company, Tree Top Industries,Inc. The President is David
> Reichman <#>
> who is one of
> the most suspicious and poorly performing individuals who I
> have ever
> met. His
> trail of irregularities and SEC filings is so blatant that
> anyone
> looking at it
> sees his obvious activities.
>
> Your Client Rudy Durand <#> was a principle in TTII
> <#> in or around
> 2006 well before
> the reverse merger and well before I and numerous other
> investors
> placed monies
> into this company. He know what was transpiring with
> Barclay and David.
> The
> investments were under the clear and irrefutable
> leadership of your
> client

> Barclay Davis and Rudy knew of his incarceration and
> retrictions <#> .
> To avoid
> disclosing this to the DEA <#>  was both improper
> and probably
> actionable.
>
>
>
> Your clients Barclay Davis and Rudy Durant appear to have
> tried to
> unsuccessfully  conspired together to engage Jack
> Nicholson's and
> others into
> making the  movie  DEA <#> . If they claim this to
> be in error, ask
> them for proof
> before you threaten me. You have erroneously communicated
> to me that
> Barkly <#>
> Davis and/or others have invested 1.5 Million dollars into
> this movie.
> I believe
> and I am so informed that this is not true. I am informed
> by Jon
> Goldberg, one
> of the DEA <#>  agents invited by Rudy Durant to
> participate that he
> was never
> informed by Rudy about Barclay's criminal background
> even though
> Barclay was the
> one producing the movie, enjoining with the public company
> Clearvision .
> <#>
> International, and planning to raise capital against his
> court orders..
> Again,
> Rudy Durand <#>  knows Barclay Davis's criminal
> background and his
> permanent and
> unconditional restrictions in raising money and selling of
> microcap <#>
> stocks in a
> public company's was the one notifying them of this
> fact not what you
> have
> inferred.
>
> Both he and David's Reichman <#>  were enjoined
> in this public TTii <#>
> company in at
> least 2006 and formed ludicrous in conjunction with Barclay
> and Jim
> Black. Jim
> has since given back several hundred million dollars worth
> of the TTII
> <#>  stock. He
> feels that the company would not tolerate a government

> investigation.
> He also
> knows that the technology that was originally described to
> the
> investors is not
> what it is today and that the investors were never informed
> about this
> fact and
> many other pieces of untruths released by Mike Davis and
> Barclay with
> Reich
> man's knowledge.. Jim Black was never properly informed
> of Barclay or
> of
> Reichmann <#> 's backgrounds.  Clearvision
> <#>  International and its
> alter- ego
> Clearvision <#>  has both Joey and Barkley <#>
> Davis violating their
> court order by
> recently contacted investors such as Stuart Rahr <#>
> , Robbie <#> , and
> probably others to
> invest in movies such as  "shock—"that is
> entirely misrepresented by
> Barclay
> as his own creation and production which it is not. He has
> no
> connection other
> than his desire to "raise money" as he tried to
> do with Loretta's
> friend Robbie <#> .
>
>
>
> There is also another matter that is under investigation,
> which is
> threats
> against me. I am a confirmed candidate for Presidency of
> the United
> States . I
> will make the announcement and start the campaign on June
> 5th,2008.
> This means
> that any investment that I have had a recent association
> will be looked
> at with
> a electron microscope. As with Ken Starr <#> , you
> also will be
> examined for your
> role in this criminal activity. I was clearly told by the
> one that
> planned to do
> the DEA <#>  movie, Barclay, that I was to be the
> medical consultant on
> the DEA <#>
> movie. Rudy knew about this yet was untruthful it the DEA
> <#> . Rudy
> then wrote me

> threatening emails n <#>  Acapulco as if they were
> coming from the DEA
> <#>  which they
> were not. I had threats which appear to be coming from Rudy
> or one of
> his
> people.
>
> It is my belief that Rudy  has to be upfront and honest
> with these
> people in
> revaluating both his expedience and Barclay's
> restrictions. IF he were
> to
> attempt to do a movie without Jack Nicholson's full
> cooperation, which
> he
> apparently does not have at this time, not disclose
> Barclays
> restrictions in
> raisings money because he is clearly involved with a Micro
> stock
> violation with
> TTII <#> , and was to enjoin this movie with
> Clearvision <#>
> International, a public
> company, a disaster would be expected. If you were
> representing this
> scenario,
> you too would be in trouble. I have been informed by My
> investigator
> that Rudy
> Durand <#> has only made one movie in his career.
> This was made in
> 1979 and named
> "TILT". This was a movie that according to
> numerous court records
> "Flopped". Mr.
> Durant spent years in litigation and alienated numerous
> people in the
> movie
> making business in Hollywood . I was also informed that the
> script,
> "Younger"
> that he clearly states was "Recently Finished "
> in fact was finished
> 16 years
> ago and it  has never been able to be financed or
> produced. If investor
> funds
> are raised for DEA <#> , this also has to be
> disclosed. All of this
> must be fully
> disclosed before either he or Barclay talk with one
> investor. Jon
> Goldberg of
> the DEA <#>  has never been informed of Rudy Durand
> <#> 's or Barclay's
>  background, the

> Department of Justice, IRS, and other agency investigations
> and
> outcomes.ordeasrs. I was assigned by Barclay Davis, who
> told me that he
> was
> producing DEA <#> , as the medical consultant on the
> movie. This we
> discussed in
> front of Rudy Durand <#> . When I had correspondence
> with the 4 DEA <#>
>  me members who
> were personally introduced to me by Rudy Durand <#> ,
> he wrote me a
> threatening email
> to my home in Acapulco . This was followed up with two
> additional
> threatening
> emails that are now under investigation.
>
> According to my investigator, there is a very extensive web
> of probable
>
> criminal activity and violations of previous SEC and
> Department of
> Justice
> orders that is extensive. Barclay was apparently doing the
> something in
> Mexico
> ..
>
> Just for your information as you do not know me, I have had
> enough law
> school
> training to know the law. I have been involved in numerous
> lawsuits
> with
> attorneys with a  90% success. I have been involved in
> several
> fraudulent
> investments which I communicated very clearly to Barclay
> Davis, Rudy
> Durand <#>  and
> others involved in Clearvision <#> , Clearvision
> <#>  International and
> Tree top
> Industries. I was  involved in starting One hour photos
> where, due to
> fraud, I
> and the other 3 that started the co. put the fourth in
> prison and
> delicensed him
> for fraudulent embezzlement. I started  Joan Rivers
> Jewelry  Company.
> Due to
> fraud,  Joan and I put Arthur Toll into federal Prison for
> using
> fraudulently
> bonds  to do a investment purchase of the company. I
> received

> disengorgement
> payment after 15 years. I was defrauded by Four Star
> Financial, Inc. We
> Placed
> the attorney, Mark Cohen, in Jail, delicensed both
> accountants, and
> there is
> still pending litigation where several other processionals
> are going to
> probabably <#> be going to federal prison.. All
> of them knew about
> these bad
> experiences and now they have created another. I am
> presuming that you
> know or
> should know about their activities.
>
> My wife and I are very tired of this investment fraud and
> do not wish
> to
> testify in another investigation, testify in front of grand
> Juries, sit
> through
> trials,etc.
>
>
>
> Barclay Davis and David's Reichman <#> promised
> that they would
> reimburse the
> investments and interest that we have in TTII <#> .
> They have been
> instructed on how
> to place the funds with my attorney. I have extensive
> documentation on
> this
> matter that is sitting with my attorney and in safes.. I am
> also
> protected with
> security in case any of them wish to attempt another
> foolish physical
> threat.
>
> We just want to great our money out and never see them
> again. If they
> fail to
> live up to their promise, then we will be forced to provide
> all of this
> information to the authorities and receive our moneys from
> disengagement and
> civil litigation as we did before..
>
> Please do notify your clients that they should follow their
> promise.
>
> In addition, I do not want you, as their attorney, to get
> involved. I
> am not
> threatening but merely providing you with information that

> I have in my
> possession from a investigator.
>
> You personally and professionally cannot afford to have
> this matter
> investigated
> . Either you do not know about the abundant additional
> crimes and
> activities by
> your clients around you or you don't care to know.
>
>
>
> I would highly encourage you, as others are doing, to have
> your clients
> not
> breech their promise to me and my wife and refund our
> investment with
> interest
> so we can put this terrible experience behind us and never
> see them
> again.. I
> truly don't want to sit in a courtroom and see someone
> go off to jail.
> As a
> investor, I have experienced these people's pain more
> than you know.
>
> I expect the courtesy of a acknowledgement of a response
> and your
> willingness to
> deal this matter in the best way for us.
>
> Sincerely,
>
>
>
> Steven M <#> . Hoefflin, MD, FICS <#> , FACS
> <#>
>
> Founder ,President and CEO
>
> The Hoefflin Child Education Institute
>
>
>
> Immediate Past President
>
> The Los Angeles Society of Plastic Surgeons
>
>
>
> 1530 Arizona Avenue
>
> Santa Monica, California 90404
>
> Phone:  (310) 451-4733
>
> Fax:      (310) 451-5653

```
>
> Web:    www.hoefflin.com
> <http://www.hoefflin.com/>
> <http://www.hoefflin.com/>
>
>
>
> =================■■■■
```

> From: drhoefflin@gmail.com [mailto:drhoefflin@gmail.com] On Behalf Of Steven
Hoefflin, MD, FACS
> Sent: Thursday, June 05, 2008 2:14 PM
> To: tmlaing@lasd.org
> Cc: 34838@lapd.lacity.org; 17961@lapd.lacity.org; TMHayes@lasd.org; steven@hoefflin.com
> Subject: our previous conversation this morning
>
>
>
> Dear Tom:
>
> As I told you, I have had numerous, well-documented threats and one attempt on
my life. After my placement in an Intelligence Unit when I was drafted for
Vietnam in 1964, I have been regularly involved, both visually and undercover,
in 11 Divisions of the DOJ. I have extensive documentation and proof of this
work and the cases that I was involved in over the years. I am currently
involved in the undercover and now publically filed Disney Self-Insurance Fraud
that may result in the arrest of its President, Robert Iger. I am currently
involved in "Operation Red Roulette", a anti-drug trafficking Operation in
Acapulco Mexico. I have a home In LA Cima. I was involved in the arrest and
incarceration of the largest Mexican drug king at the time---Beltran.
>
> The attempts on my life are coming from a well known group of multiple-convicted felons now involved in scamming investors using fabricated
Movie deals (DEA led by Rudy Durand) and penny stock scams. You can see the
criminal involvement of this group if you Google the leader of this group "
Barclay Davis". His alias is Mervin Davis. Also involved are his other criminally indicted felons, his wife Loretta Davis. She is my patient of 12
years and this is how I became involved with this group. I was also scammed by
this group and therefore became suspicious and discovered them. I never

knew
her criminal background.
>

> It has been determined that the threats on my life and those of James
Black,
are coming from this group, including Rudy Durand and the "money man",
David
Reichman.
>

> I have known Arthur Kassel for many year and I believe him to be
innocently
involved with this group. Unfortunately the FBI has photos, recordings,
and
documents showing that author is at least involved closely with them.
Arthur has
apparently placed Rudy Durand on some sort of board or program
involving a
Police Department event. This is not good.
>

> As the West Los Angles Police and/or United States Attorney's office
is going
to be arresting this group in the next few days, I was trying to tell
Arthur
that he should ask Chief Baca to get involved and to help prevent them
from
arresting Arthur before they hear from him and me again. He is being
very
suspicious and arrogant as Arthur Kassel is directly involved. I
believe that he
is innocently involved with this group, but he is being very arrogant
and acting
very suspicious. This is the reason for my contacting you to warn him
that this
group, including Arthur, are gong to be arrested in the next few
days.The FBI
has been investigating this group of felons for the last 3 months. When
told one
of the investigators that I believed Arthur was innocent (which I still
do
despite his thinking that I am making this up), they told me that they
have
photographs, recordings, and evidence that he was involved with the
> ring leader of the Movie Scamming part of this group-Rudy Durand.
Unfortunately, I was told Arthur has associated Rudy Durand with the
Police
Department in some upcoming charitable event.

>

> The following are the agencies that have interviewed me a number of times. I
have told all of them that it was my belief that Arthur is not involved. They
feel, from the evidence in their possession that he is and are going to proceed
as planned. This, again, is the reason for me contacting you to help present this
potential disaster for Arthur. He is not the only one that may innocently get
involved in this matter. At least 2 or more of the DEA agents are involved as
they sent threatening letters to me in Acapulco. There are definitely 2 dirty
LAX police involved. As there is no other jurisdiction, I was asked to go to the
United States Attorney's Office to provide documentation of their involvement in
the possible drug related threats and attempt top falsely arrest me before I got
on the plane for Mexico to start this undercover drug operation. All of this
group knew my plans and travel agenda as I foolishly trusted them and told the
DEA

> agents exactly what I was doing, where, and when. All four of the agents
stopped talking with me and started these email, fax, phone calls, and
ultimately threats on my life, which resulted in a man pulling a gun on me.

>

> Fortunately, I was able to talk my way out of it as I speak enough Russian to
deal with him. This is all abundantly proven with numerous documents,
recordings, witness statements, reports to numerous Mexican Authorities
including using President Calderon's Secret Service, their DEA, their police, my
private security in Mexico. I went into hiding. My wife called the Saudi Arabian
Price head of security, who brought in a private plane and flew me out.

>

> Please see the attached list of contacts of those involved in this case.

>

> Sincerely,

>
> Steven M. Hoefflin, MD, FCS, FACS
>
>

# HANTMAN & ASSOCIATES

ATTORNEYS AT LAW
1414 AVENUE OF THE AMERICAS
SUITE 406
NEW YORK, NEW YORK 10019
(212) 684-3933
FAX  (212) 755-1989

www.Hantmanlaw.com

ROBERT J. HANTMAN*†^
CARLOS M. CARVAJAL*

*New York Bar
†New Jersey Bar
^ Also admitted to Pennsylvania and Florida Bars

JOSEPH J. FERRARA
OF COUNSEL
111 PATTERSON AVENUE
HOBOKEN, NEW JERSEY 07030
(201) 798-5010
FAX (201) 798-5070

June 9, 2008

*VIA E-MAIL: Steven@hoefflin.com*
Dr. Steven M. Hoefflin M.D.
1414 Moraga Drive
Los Angeles, CA 90049

Re:    **Defamation – Trade Disparagement- Harassment -Extortion**

Dear Dr.Hoefflin:

We have been retained to represent Tree Top Industries Inc. ("Tree Top" or "TT") and David Reichman in his corporate capacity. At the outset, you – including any agents, representatives, employees, friends and family- are hereby directed to immediately cease and desist from engaging in any further intentional and malicious disparagement of our clients, and are directed not to threaten them, attempt to intimidate or extort them and definitely not to contact them directly, or indirectly – including electronic mail ("E-mails") - until this matter is resolved. I have also advised Mr. Reichman not to contact you.

As I am not aware that you have retained counsel, I suggest that any future communications from you be by letter and directed to our office by your attorney. If you have counsel, please direct this letter to him or her immediately and ask them to respond. I apologize for any inconvenience to you, especially as I understand you may be considering a "run for the Presidency" and I would not want to distract you in any manner.

You are also directed to cease and desist from communicating any derogatory comments to any third persons and specifically not to interfere with the attempted damaging of our clients' reputation including that of Tree Top which, ironically, will continue to decrease the value of your stock in Tree Top if not immediately abated.

1

In addition, we are not aware of any factual basis to support the many allegations contained in the numerous E-mails we have been provided by our clients. We understand that your decision to purchase stock in Ludicrous, Inc. was at the suggestion of your friend of over ten (10) years, Mr. Merv Davis. It is also our understanding that you subsequently chose to exercise an option to purchase additional Ludicrous, Inc. stock.

In addition, we understand that in October, 2007, you signed an Acquisition Agreement. Then, in November, 2007, Tree Top acquired 100% of the ownership of Ludicrous, Inc. in a one for one share exchange with the requirement that all shares would be restricted and placed in a voting trust for two years.

In any event, please provide us with any substantiation for the numerous allegations contained in any of your previous E-mails which you have in your possession, custody, or control including "electronic data" stored on a computer, network server, internet server, backup tape, or other electronic media that is relevant to any of the issues raised by you. Such electronic data is a valuable and irreplaceable source of information, is subject to discovery in litigation, should this matter not be resolved and may be admissible at trial.

We also demand that you issue a full and complete retraction, well beyond a mere apology, of the false and defamatory assertions in the various E-mails and correspondence sent by you, so as to mitigate damages.

Electronic data includes, but is not limited to: originals and all copies of Internet Web sites; Web site traffic reports and server logs; E-mail; activity listings of Web sites and E-mail receipts and/or transmittals; voice-mail; audio or video recordings of any kind; computer programs (whether private, commercial or a work-in-progress); programming notes or instructions; output resulting from the use of any software program, including word processing documents, spreadsheets, database files, charts, graphs, and outlines; operating systems; source code of all types; PIF files, batch files; ASCII files; and all miscellaneous electronic files and/or file fragments, regardless of the media on which they are stored and regardless of whether the data resides in an active file, deleted file, or file fragment. Electronic data also includes any and all information stored in hard disks, floppy disks, CD-ROM disks, Bernoulli disks and their equivalents, magnetic tapes, and computer chips (including but not limited to EPROM, PROM, RAM, and ROM). Electronic data also includes the files, folder tabs, containers, or labels appended to any storage device containing electronic data.

You have affirmative obligations under the law to take immediate steps to preserve all information relevant to all of your claims or that is reasonably likely to be subject to discovery. Accordingly, we request that you conduct a full and complete backup of all electronic data and otherwise refrain from:

1. conducting any procedure that would alter any active, deleted, or fragmented electronic data (including, but are not necessarily limited to, deleting or attempting to delete any electronic information, saving newly-created files to

disks that already contain information, loading new software on such disks, or running data compression or de-fragmentation (optimization) routines on them);

2. rotating, altering, or destroying any media that stores electronic data where such activity could result in the alteration or loss of any electronic data; or

3. disposing of any media that contains electronic data.

If we discover that proper steps have not been taken to preserve this crucial data and that some of it has been lost as a result, we will seek appropriate relief and sanctions from the court should this become necessary.

This letter is not intended to be a fully exhaustive recitation of the facts and is for settlement purposes only, as we believe that our client has certain claims against you.

However, I trust that you and your lawyers will agree that it is not in anyone's interest to litigate this matter and that the most practical resolution is an exchange of general releases and the preparation and signing of a settlement agreement that will include, among other things, a nondisparagement clause.

I await a prompt response from your lawyer and suggest that any further communication be in person – face-to-face – with all principals present, as a self-serving letter writing campaign is a waste of time and benefits no one.

Very truly yours,

/s/

Robert J. Hantman

cc: David Reichman

3

## HANTMAN & ASSOCIATES

ATTORNEYS AT LAW
1414 AVENUE OF THE AMERICAS
SUITE 406
NEW YORK, NEW YORK 10019
(212) 684-3933
FAX   (212) 755-1989

www.Hantmanlaw.com

ROBERT J. HANTMAN+†^
CARLOS M. CARVAJAL*

*New York Bar
†New Jersey Bar
^ Also admitted to Pennsylvania and Florida Bars

JOSEPH J FERRARA
OF COUNSEL
111 PATTERSON AVENUE
HOBOKEN, NEW JERSEY 07030
(201) 798-5010
FAX (201) 798-5070

June 16, 2008

*VIA E-MAIL: Steven@hoefflin.com*
Dr. Steven M.  Hoefflin M.D.
1414 Moraga Drive
Los Angeles, CA 90049

Re:   **Extortion - Defamation – Trade Disparagement- Harassment –**

Dear Dr.Hoefflin:

As you are well aware, our firm represents David Reichman, a resident of New York, and Tree Top Industries, Inc. ("Tree Top"), a Nevada Corporation. This letter is to serve as a follow up to our June 3, 2008 "cease and desist" letter. After further review of the numerous emails and correspondence, including those listed below, in which you defame and disparage our clients, we request that you issue a complete retraction, well beyond a mere apology, so as to mitigate damages you've inflicted.

Your unfounded, accusatory statements and allegations have and continue to irreparably damage our clients' reputation and standing in the business community. As I indicated in my June 3, 3008 letter, the Tree Top stock price has suffered since your campaign commenced falsely and irresponsibly disparaging our clients' name and reputation. Why you are doing this when the actions complained of are hurting the value of your own stock is incomprehensible.

In any event, our clients are aware of no foundation upon which you base your various accusations set forth in your emails. In addition, as a significant portion of your defamatory correspondence have been directed at shareholders and officers of Tree Top, you are causing a tremendous strain upon the company's day-to-day operations.

The following e mails are some of the defamatory comments and accusations made by you, to or about our clients, David Reichman and Tree Top:

1

The following are some of the defamatory comments and accusations made by you, to or about our clients, David Reichman and Tree Top:

In a May 8, 2008 correspondence to David Reichman, you asserted the following:

> "You [Reichman] are creating crazy SEC reports and overstating company hardware and goodwill assets (TTII) your erroneous and false SEC reports for TTII and probably the other 2 companies, and many other apparent improprieties are just exploding red flags."

In a May 27, 2008 correspondence to Loretta Davis, you asserted the following:

> "He [Reichman] is the obvious ringleader and investor money thief in the group."

> "In addition the investigator stated that 'He [Reichman] is worse than the bank robber that held up a bank and left his checkbook at the window. He [Reichman] also left his Photo ID Driving License, all of the criminal SEC filings, his cell phone number, his Bahamas bank account, and the name and phone numbers of all thieves in TTII 'Ocean 13' members in crime.' "

> "He [Reichman] may have also been in Jail."

> "He [Reichman] looked like a Hyena dressed in lambs clothing watching all of the potential investor victims as they passed by and were interviewed."

> "His [Reichman] pathological greed just stood out like a search light. Paying himself a 2.7 million dollar salary, repaying bad debt in his original TTII (a bad company with a huge debt, 5 lawsuit judgments that were never paid, probably the association with previous crimes, and just the worse company to place Ludicrous into, was an attempt for him to "pay off his personal mismanagement of another company" prior to it joining Ludicrous in Nov 1, 2007."

> "David pocketed the money, flew to the Bahamas telling people that he was going to New York, or pocketed the money himself and cooked the books so it looked like we only invested $600,000. Possibly he paid himself a portion of his $2.7 Million dollar salary when there was no company income, or other criminal activity."

2

> "He and David [Reichman] obviously saw and possibly
> covered up some of the problematic SEC filings and
> accounting."

> "David flew his own criminal attorney in from New York
> and had him harass and tamper with witnesses Paul
> Brownstein and Jim Black."

In a June 4, 2008 correspondence to the Securities and Exchange Commission,
you asserted the following:

> "Penny Stock Swindling: Tree Top Industries, Inc (TTII).
> This is a long existing dirty company owned by swindler
> David Reichman. He started his career out in 1978 by
> turning in, with his then wife Sue, 125 bogus chiropractor
> bills to his insurance company."

> "They then 'reverse merged" this company into David
> Reichmann 's TTII Public Company that already had
> fabricated $15 Million dollar losses without any historical
> products or activities."

In an undated correspondence to Mr. Krause-Leemon, you asserted the following:

> "The President is David Reichman who is one of the most
> suspicious and poorly performing individuals who I have
> ever met. His trail of irregularities and SEC filings is so
> blatant that anyone looking at it sees his obvious activities."

In a June 5, 2008 correspondence to Tom, you asserted the following:

> "It has been determined that the threats on my life and
> those of James Black, are coming from this group,
> including Rudy Durand and the "money man",
> David Reichman."

Your embellished, exaggerated and false description of the events surrounding
Tree Top and its founding partners, particularly Mr. Reichman, appears to be no more
than a blatant intentional and premeditated effort to "smear" both Mr. Reichman's and
Tree Top, Inc.'s reputation without any factual proof that the accusations are true and
without any investigation whatsoever

As such, we hereby demand a full and complete retraction of your accusatory and
defamatory statements regarding Mr. Reichman and Tree Top.

3

This letter does not constitute a complete or exhaustive statement of our client's rights, claims, contentions or legal theories, or the facts, which support those claims. Nothing stated herein is intended as, nor shall it be deemed to constitute, a waiver or relinquishment of any of our client's rights or remedies, whether legal or equitable, all of which are hereby expressly reserved.

I also notice that you have sent additional e-mails which shall also be part of any future litigation to the extent they are part of your continuous pattern to "extort", defame and harass Tree Top Industries and David Reichman

Finally, I request the opportunity to review and discuss the demanded retraction before it is issued.

Respectfully,

/s/

Robert J. Hantman, Esq.

4